THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
SYLVESTER J. STRONG, Defendant-Appellant.

First District (5th Division)   No. 78-1499

Opinion filed November 30, 1979.

James J. Doherty, Public Defender, of Chicago (Zaven Peter Tokatlian and Suzanne M. Xinos, Assistant Public Defenders, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Myra J. Brown, and Bruce W. Lester, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE MEJDA delivered the opinion of the court:

Following a jury trial, defendant was found guilty of murder (Ill. Rev. Stat. 1973, ch. 38, par. 9—1) and was sentenced to a term of 30 to 60 years. On appeal he contends that: (1) the trial court erroneously instructed the jury regarding voluntary manslaughter (Ill. Rev. Stat. 1973, ch. 38, par. 9—2(a)); and (2) he was not proved guilty beyond a reasonable doubt. We affirm. The following pertinent testimony was adduced at trial.

*For the State*

Rosie Garret, the victim's mother, testified. On March 25, 1976, she and various members of her family including the victim, Shelley Williams, were going to her sister's house. They rode in two cars. Shelley Williams drove one and she followed in the other. After turning a corner, Shelley stopped his car and Ms. Garret stopped also. She saw defendant getting off a bicycle in the street. Shelley got out of his car and called to defendant. Shelley and defendant talked for a moment and then Shelley called Ms. Garret over to them. Shelley asked her if defendant was the one who had cursed her on an earlier occasion. She responded that he was. Defendant apologized to Shelley who told him to apologize to his mother. As defendant turned toward Ms. Garret, defendant's brother-in-law, George Howard, ran down the street with a pistol and fired two shots but did not hit anyone. Defendant ran over to Howard, told him "he wasn't trying to shoot the m_____ f_____" and took the gun. Shelley threw up his hands and said he didn't want to fight. Defendant shot Shelley twice and Shelley fell, face down, near a fireplug. Defendant then took several steps toward Shelly and shot him again from a distance of five feet.

Defendant began to run but his escape was cut off by Clarence Williams, Shelley's brother, who drove Shelley's car into a wall, knocking defendant down. Clarence got out of the car and began kicking defendant in the head. Ms. Garret saw defendant's wife approaching with a bat and she took the bat from her. Ms. Garret repeatedly struck defendant with the bat until it hit a wall and shattered. Two policemen then pulled her off defendant. Defendant was immediately taken into custody.

In the meantime, Ms. Garret's brother had taken the gun from defendant and had run to his mother's house with it.

On cross-examination Ms. Garret testified that on March 2, 1976, she had an argument with defendant at her sister Sadie's and her brother Henry's birthday party. Defendant asked her to go out with him but she refused. Defendant was upset by this and said, "Bitch, what do you think, you're too good to go out with younger mens [*sic*]?" One of her younger sons was present and had told decedent what was said. She was also aware of an argument between members of her family and defendant's family that took place on March 24, 1976, but she was not present at that time.

Ms. Garret denied that anyone threatened defendant or approached him with bats or sticks. She stated that the conversation between Shelley and defendant was peaceful and not an argument until George Howard arrived.

Willie Williams testified. On March 25, 1976, he went to visit Ms. Garret at her home. After she received a phone call, he and other members of her family drove to her sister's house. After stopping at Ms. Garret's sister's house and then her mother's house, Shelley Williams went to get some beer with three others. Willie Williams followed in the second car with Ms. Garret. At one point Ms. Garret stopped and Willie could see Shelley get out of his car. Defendant was on the sidewalk riding a bicycle. Shelley spoke with defendant and then called Ms. Garret. Defendant attempted to leave but Shelley called him back. As Willie got out of the car he heard two shots and saw defendant take a gun from his brother-in-law, saying "Give me that gun, you are not trying to shoot the m____ f____." Defendant shot Shelley twice and Shelley fell. Defendant took several steps toward Shelley and shot him in the back.

Defendant ran down the street but was cut off when Clarence Williams drove Shelley's car into a wall. Willie did not see what happened afterward because he and several others were putting Shelley into a car.

On cross-examination Willie stated that the conversation between Shelley and defendant was peaceful until defendant threw up his hands to fight.

Clarence Williams, the victim's brother, testified. On March 25, 1976, he rode with his brother Shelley to his aunt's house. On the way they saw defendant on a bicycle and Shelley stopped the car. Shelley got out of the car and spoke to defendant. Defendant put his fists up but then put them down and spoke to Shelley. Shelley waved at his mother's car and his mother went to Shelley and spoke to the two. As Clarence was getting out of the car, George Howard walked up to him. Howard asked what was happening and Clarence told him he didn't know. Howard walked

away and Clarence heard a shot. Clarence turned and saw Howard pointing a gun in the direction of a friend. Defendant ran over to Howard, said "Give me that gun, you are not trying to shoot the m_____ f_____" and took the gun. Defendant shot Shelley twice and he fell to the ground. Defendant then shot him a third time in the back and began running down the street. Clarence got in the car and pulled in front of defendant and struck a wall to cut off his retreat. Defendant ran into the side of the car and fell. Clarence got out of the car and kicked defendant in the face. Henry Williams, Clarence's uncle, disarmed defendant. Ms. Garret, Clarence's mother, came over and beat defendant with a bat. The police arrived and broke up the fight. At that time. Shelley was no longer there.

On cross-examination Clarence said that the conversation between Shelley and defendant was peaceful and that he did not see anyone hit defendant with bats or 2 x 4's before the shots were fired.

Chicago police investigator Geinosky testified that on March 25, 1976, while on duty, he received a radio broadcast directing him to the scene of the shooting. When he arrived he saw two groups of people, one near a white Cadillac and the other on the sidewalk. After speaking with Ms. Garret and her sister Catherine, Geinosky went to George Howard's home and arrested him. After placing Howard in the squad car, he returned to the area of the Cadillac and saw defendant on the ground bleeding heavily from his head. There was blood on the ground around defendant and also some slivers of wood. Another police officer gave Geinosky a five-shot revolver with all five shells expended.

On cross-examination Officer Geinosky testified that he did not see any 2 x 4's or bats at the scene.

Both sides stipulated that, if called, a firearms examiner of the Chicago Police Department would testify that after a comparison of two bullets recovered from the victim's body and a test bullet fired from the revolver recovered by the police, it was his professional opinion that the two bullets from the victim were fired from that revolver.

### For the Defense

Defendant testified in his own behalf. On March 24, 1976, at about 7 p.m. he and several friends were listening to music at a friend's house. He heard some noise, looked out the window, and saw a lot of people in front of Mary Collins' house. Janice Howard and Catherine Williams were arguing. He went to Mary Collins' house and she told him that Catherine was arguing because someone had broken her window and had thrown water on her children. While he was there, someone threw a brick through Mary Collins' window. He looked out the window and saw Sadie Williams attempting to throw another brick. Defendant went downstairs and encountered an excited "kind of fat boy" whom defendant attempted

to calm down. About five minutes later Ms. Garret and some others arrived and asked defendant what was going on, to which defendant replied that he didn't know. Defendant's wife was arguing with one of the boys who came with Ms. Garret. Catherine Williams walked up armed with a knife in her hand and defendant intervened and pushed his wife home.

Police arrived about 10 minutes later and stopped the argument. As Ms. Garret was preparing to leave, Sadie Williams said that she knew Ms. Garret would come back to finish the fight. Ms. Garret replied that she would return the next day.

On the following day, defendant was at Mary Collins' house with George Howard and several others listening to music. At one point he left the apartment and borrowed a bicycle to ride. His pant leg became caught in the chain and he stopped to free it. A white Cadillac rounded the corner, stopped suddenly and backed up to within 10 feet of defendant. The driver, Shelley Williams, jumped out and made a profane inquiry of defendant. Defendant was puzzled at first but assumed that Shelley was referring to the events of the past night. Henry Williams also got out of the car and he and Shelley approached defendant. Defendant retreated and Shelley told him not to run. George Howard ran up and asked why the two were chasing defendant. Shelley accused defendant of saying something about his mother and told a little girl to get her mother. At that time a station wagon came around the corner and the occupants jumped out carrying sticks and bats. Shelley told defendant that he was going to knock defendant's head off his shoulders. Catherine Williams arrived and told Shelley that defendant was the person who insulted Ms. Garret. Shelley hit defendant and the others started to hit him with bats and sticks. He fell and they kept beating him in the head and face. He heard a shot and was able to break away from them and ran towards George Howard. Defendant grabbed a gun from Howard and began shooting, but not at anyone in particular. After the gun was empty defendant's attackers resumed beating him. Defendant got up again and staggered down the street and someone tried to run him over with a car. The driver drove the car into a wall, jumped out and began beating defendant. He lost consciousness and woke up in a police paddy wagon.

Although he requested immediate medical attention, defendant was taken to the police station first.

Defendant testified that he fired the gun because the people were trying to kill him. He denied attending a party on March 2, 1976, where he argued with Ms. Garret.

On cross-examination defendant testified that neither Shelley nor Henry Williams had any weapons in their hands when they first got out of the car. When he shot the gun he could not see clearly because blood was

in his eyes. He fired all three shots from the same position and in rapid succession. He could not see at whom he was shooting nor did he know who was closest to him.

At the police station, he told an officer that he didn't shoot the man or know how he was shot.

Ada May Howard, defendant's mother-in-law, testified. Defendant and his family reside with her. On March 24, 1976, she witnessed an argument between Catherine Stockmeyer, Sadie Williams, Rose Garret, and her daughter, Mary Collins. Police were called and the argument was stopped. Ms. Garret, Sadie Williams and Catherine Stockmeyer told her that they were going to call Shelley Williams. Later, they said that they had reached Shelley and that he would be over at 4 p.m. the next day.

She saw Ms. Garret the next day, beating defendant with a baseball bat. Sadie Williams and Catherine Stockmeyer were also beating defendant.

*State's Rebuttal*

Chicago police officer Lewkowicz testified. On March 25, 1976, at about 5:15 p.m. he was assigned to transport defendant to St. Elizabeth's Hospital. He took defendant directly to the emergency room. About 8 p.m. he took defendant to a police station.

An employee of the medical records department of St. Elizabeth's Hospital testified that defendant's medical records indicated that he was admitted to the emergency room of the hospital at 5:20 p.m. on March 25, 1976.

Arthur Anderson testified. On March 24, 1976, he was drinking and listening to records in his apartment with defendant. He heard an argument outside and went out to find Mary Collins, Catherine Stockmeyer, and Sadie Williams arguing. He did not see Ada May Howard or Ms. Garret there.

On the next day at about 5 p.m., he saw a group of people on the street in front of his house. When he went to investigate, George Howard ran past him with a gun in his hand. Howard fired two shots and then defendant ran up to Howard and grabbed the gun "because he was going to shoot the m_____ f_____." Defendant walked toward Shelley Williams who had his hands up and was walking backwards. Defendant shot Shelley twice and he fell to the ground about two feet from a fireplug. Defendant walked over and shot Shelley a third time. Defendant then began to run in Anderson's direction. He did not observe any blood on defendant's head or clothes. A car pulled up and crashed into a wall. Anderson walked towards the victim and saw him being loaded into a car. He walked back towards the car and saw Ms. Garret hitting defendant with a baseball bat until it hit the concrete wall and broke.

Investigator John Leonard testified that on March 25, 1976, he saw defendant at St. Elizabeth's Hospital at 5:45 p.m. and at a police station at 8 p.m.

*Jury Instructions Conference*

The State submitted Illinois Pattern Jury Instructions, Criminal, Nos. 7.03 and 7.04 (1968) (hereinafter cited as IPI Criminal) on voluntary manslaughter. Defense counsel objected and contended that there was no evidence presented to show that defendant was acting under a sudden and intense passion caused by the victim's provocation. The judge ruled that the instructions would be given since there was testimony at trial, which if believed by the jury, would support a finding of guilty of voluntary manslaughter. IPI Criminal Nos. 7.05 and 7.06, dealing with voluntary manslaughter based on an unreasonable belief that the killing was justified (Ill. Rev. Stat. 1977, ch. 38, par. 9—2(b)), were also given.

During its deliberation, the jury returned the two voluntary manslaughter instructions, *i.e.*, intense passion due to provocation and unjustified use of force, with a message requesting a clarification with respect to the difference between them. The judge returned a message explaining that he could not respond until the attorneys for both sides were present. He then called the attorneys and told them to return to court immediately. Defense counsel arrived about 45 minutes later. During that time the jury requested that the two instructions be sent back and the judge returned them. While the judge and counsel were formulating an answer, the jury indicated that it had reached a verdict. The jury found defendant guilty of murder and judgment was entered on the verdict.

OPINION

I

Defendant first contends that the trial court erred by instructing the jury on voluntary manslaughter due to a sudden and intense passion (Ill. Rev. Stat. 1977, ch. 38, par. 9—2(a)) since there was no evidence of provocation or passion presented at trial. He argues that the evidence showed that the shooting was either: (1)murder; (2) a justifiable homicide done in self-defense; or (3) voluntary manslaughter because his belief that the homicide was justified was unreasonable. (Ill. Rev. Stat. 1977, ch. 38, par. 9—2(b).) He also urges that the two different voluntary manslaughter instructions confused the jury and that the court's failure to clarify the issue was also reversible error.

■■ Initially, the State urges that defendant has waived this issue by his failure to include the instructions in question in the record. (*People v. Husband* (1954), 4 Ill. 2d 451, 123 N.E.2d 315; *People v. Todaro* (1958), 14

Ill. 2d 594, 153 N.E.2d 563.) Although the trial transcript includes the instructions as read by the judge, the State maintains that this is insufficient to preserve the issue for review.

Supreme Court Rule 608 (Ill. Rev. Stat. 1977, ch. 110A, par. 608) dealing with the record in a criminal appeal, requires that the originals or copies of the instructions be included in the record. However, that rule also provides that: "There is no distinction between the common law record and the report of proceedings, for the purpose of determining what is properly before the reviewing court." Since the challenged instructions appear in the transcript of record, we will address the merits of defendant's contention.

■ It is well settled that in homicide cases, if there is evidence in the record which, if believed by a jury, would reduce the crime to manslaughter, a manslaughter instruction should be given. (*People v. Simpson* (1978), 74 Ill. 2d 497, 384 N.E.2d 373; *People v. Joyner* (1972), 50 Ill. 2d 302, 278 N.E.2d 756.) This is true even if the theory of defense is inconsistent with the possibility that defendant is guilty of the lesser crime (*People v. Lewis* (1977), 51 Ill. App. 3d 109, 366 N.E.2d 446) and defense counsel objects (*People v. Pierce* (1972), 52 Ill. 2d 7, 284 N.E.2d 279; *People v. Lewis*). Both the State and defendant are entitled to instructions presenting their theories of the case, if supported by evidence. (*People v. Isenberg* (1978), 60 Ill. App. 3d 325, 376 N.E.2d 778; *People v. Davis* (1974), 18 Ill. App. 3d 173, 309 N.E.2d 338.) Very slight evidence upon a given theory of a case will justify the giving of an instruction. (*People v. Khamis* (1951), 411 Ill. 46, 103 N.E.2d 133; *People v. Dordies* (1978), 60 Ill. App. 3d 621, 377 N.E.2d 245.) We must determine whether there is evidence in the instant record which justified giving the challenged instructions.

■ IPI Criminal Nos. 7.03 and 7.04 correspond to the statutory definition of voluntary manslaughter found in section 9—2(a) of the Criminal Code of 1961 (Ill. Rev. Stat. 1977, ch. 38, par. 9—2(a)) and the issues instruction for that offense. Under that definition, a person commits voluntary manslaughter when he kills an individual without lawful justification, "acting under a sudden and intense passion resulting from serious provocation * * *." Serious provocation is "conduct sufficient to excite an intense passion in a reasonable person." (Ill. Rev. Stat. 1977, ch. 38, par. 9—2(a).) The only types of conduct recognized as serious provocation are substantial physical injury or assault, mutual quarrel or combat, illegal arrest, and adultery with the offender's spouse, but not mere words or gestures or trespass to property. *People v. Crews* (1967), 38 Ill. 2d 331, 231 N.E.2d 451; *People v. Hammock* (1979), 68 Ill. App. 3d 34, 385 N.E.2d 796.

Defendant argues that none of the State's evidence showed that defendant shot the victim while acting under a sudden and intense passion, but rather, it showed that the two were engaged in a peaceful conversation before the shooting. Defendant asserts that his testimony showed only justified self-defense or an unreasonable belief that the shooting was justified. We do not view his testimony so narrowly.

Defendant's testimony showed that the victim hit him and that several others beat him with bats and sticks while he was on the ground. He began bleeding from his wounds and the blood was in his eyes. After hearing a shot, defendant ran to George Howard, grabbed the gun and began shooting blindly at his attackers. Clearly this testimony showed a substantial physical injury and assault, or mutual combat. This was evidence from which a jury could conclude that defendant acted under a sudden and intense passion due to serious provocation. Since the jury would not be limited to defendant's interpretation of his testimony and could have found that the evidence established voluntary manslaughter under section 9—2(a), the trial court did not err in instructing the jury on this theory. *People v. Humble* (1974), 18 Ill. App. 3d 446, 310 N.E.2d 51; *People v. Milton* (1979), 72 Ill. App. 3d 1042, 390 N.E.2d 1306.

Defendant asserts that the jury's return of the instructions with the inquiry regarding the difference between the two manslaughter instructions demonstrates the confusion caused by the submission of the two instructions. He further asserts that the trial court's failure to respond to the question and clarify the point of confusion was reversible error.

Generally, additional instructions may be given in a criminal case after the jury has retired provided that the State, the defendant and his counsel are present and given an opportunity to submit further instructions. (*People v. Jones* (1976), 40 Ill. App. 3d 771, 353 N.E.2d 79.) Refusal of a court to clarify a specific question on a point of law raised by the jury has been held to be reversible error in several cases. (*People v. Land* (1975), 34 Ill. App. 3d 548, 340 N.E.2d 44; *People v. Kucala* (1972), 7 Ill. App. 3d 1029, 288 N.E.2d 622; *People v. Harmon* (1968), 104 Ill. App. 2d 294, 244 N.E.2d 358.) Those cases suggest that the court has a duty to clarify the point in question when the jury indicates confusion.

In the instant case, the trial court did not refuse to clarify the instructions, but properly informed the jury that he could not respond to their inquiry until the attorneys were present. Before the attorneys arrived the jury asked for the return of the instructions, indicating that the question had been resolved. Defendant's suggestion that the verdict was the result of confusion is a matter of speculation and a challenge to the mental processes by which the jury reached its verdict. Such an inquiry is improper since a jury's verdict may not be impeached on these grounds.

(See *People v. Holmes* (1978), 69 Ill. 2d 507, 372 N.E.2d 656.) Accordingly, defendant's conviction of murder will not be disturbed on this basis.

## II

Defendant also contends that he was not proved guilty of murder beyond a reasonable doubt. He asserts that the testimony of the State's witnesses was highly improbable, while his testimony presented a plausible explanation of the events which established that he acted in self-defense. He points specifically to the time gap between defendant's alleged insult to Ms. Garret and the confrontation between defendant and the victim, and the fact that the shooting was preceded by a peaceful conversation according to the State's witnesses. He submits that there was no reason for defendant to shoot the victim over an incident that occurred three weeks previously and that it is inconceivable that the peaceful conversation suddenly became a shooting spree when George Howard arrived.

■ The evidence in the case was conflicting as to the events preceding the shooting. In such a case it is the prerogative of the trier of fact to ascertain the truth. (*People v. Manion* (1977), 67 Ill. 2d 564, 367 N.E.2d 1313, *cert. denied* (1978), 435 U.S. 937, 55 L. Ed. 2d 533, 98 S. Ct. 1513.) A reviewing court will not substitute its judgment for that of the trier of fact on questions involving the weight of the evidence or the credibility of witnesses and reverse a conviction unless the evidence is so improbable as to raise a reasonable doubt of guilt. (*People v. Stringer* (1972), 52 Ill. 2d 564, 289 N.E.2d 631; *People v. Berland* (1978), 74 Ill. 2d 286, 385 N.E.2d 649.) In the instant case the jury obviously believed the State's witnesses and their version of the events. Instead of finding the evidence improbable and showing an inconceivable result, the jury found that it was credible and established a senseless and vicious murder. A careful review of the record does not reveal that the evidence is so improbable as to raise a reasonable doubt of defendant's guilt.

Accordingly, the judgment of the circuit court is affirmed.

Affirmed.

SULLIVAN, P. J., and WILSON, J., concur.