THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOHN CASTIGLIONE *et al.*, Defendants-Appellants.

First District (5th Division)   Nos. 85—2351, 85—2360 cons.

Opinion filed December 5, 1986.

William J. Martin and Paul C. Gridelli, both of William J. Martin, Ltd., of Chicago, for appellants.

Richard M. Daley, State's Attorney, of Chicago (Thomas V. Gainer, Jr., James E. Fitzgerald, and Sandra G. Ramos, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE SULLIVAN delivered the opinion of the court:

Following a bench trial, defendants, John Castiglione and his brother, Michael Castiglione, were found guilty of murder and were sentenced to terms of 35 years and 30 years, respectively. On appeal, defendants contend that the trial court erred in refusing to consider the defense of justifiable use of force and the lesser included offense of voluntary manslaughter, that the court improperly restricted their cross-examination of prosecution witnesses, and that they were not proved guilty beyond a reasonable doubt.

David Hense testified that sometime between 3:30 and 4 a.m. on November 13, 1983, he was having a beer with his friend Thomas Gardner at a tavern located near 63rd Street and California Avenue when Michael Castiglione punched Gardner once in the face without warning or provocation. Michael admitted the punch but explained that Gardner, a former neighbor, had called him an "asshole." Michael's brother, John Castiglione, was also in the tavern at the time of the incident. The witnesses disagreed as to whether John's friend, Ricky Blake, was present. A brawl erupted which ended when Gardner, Hense, and the Castigliones were ejected from the bar. Hense denied that Gardner fought with either Castiglione outside of the tavern. Michael, however, stated that Gardner was fighting with John as they were leaving. The fight broke up when Hense came out of the bar followed by Ricky Blake and his friends.

Hense testified further that he and Gardner followed the Castigliones to a gas station located at the northwest corner of 63rd Street and California Avenue where they engaged in a brief fistfight. Michael stated that both he and his brother were knocked down by Gardner and that Hense broke a board across his back. Michael said he gave up and that Gardner then called him a "sissy." Afterward, Hense and Gardner walked to the apartment which Gardner shared with his girlfriend, Judy Volkman, at 2917 West 62nd Street. John Castiglione went to stay with an older brother at 63rd and Washtenaw, two blocks away, and Michael returned to his father's home at 5922 South Washtenaw. Michael admitted that he did not call the police to complain of what had happened to him either at the bar or at the gas station.

David Hense, Thomas Gardner, and Gardner's girlfriend, Judy

Volkman, left the apartment between 4:30 and 5 a.m. and drove to Volkman's mother's home at 5821 South Rockwell to return her car. Hense, Gardner, and Volkman then started to walk back to the apartment. They proceeded south on Rockwell to 59th Street, west on 59th Street to Washtenaw and, with Gardner in the lead, south on Washtenaw. Gardner knew where the Castigliones lived on Washtenaw but Hense and Volkman did not. They could have taken another route which would not have taken them past the Castiglione residence.

Both Hense and Volkman stated that as they walked south on Washtenaw they saw three persons walking north toward them on the same side of the street. They did not recognize any of them until they were quite close. The two groups confronted each other on the sidewalk in front of the home located at 6018 South Washtenaw. Hense and Volkman both recognized John and Michael Castiglione, but neither witness knew the third man, later identified as Ricky Blake, or had ever seen him before. Hense and Volkman described him as 5 feet 9 inches to 5 feet 10 inches tall, weighing 160 to 180 pounds, with long brown or blond hair, and a beard. He was wearing a green army jacket and blue jeans and had a red bandanna on his head. John Castiglione was wearing a long-sleeve, red, white, and blue plaid flannel shirt, a black jacket, and blue jeans. Michael Castiglione also was wearing blue jeans.

Hense and Volkman testified that Gardner asked Michael Castiglione why he had punched him in the face earlier at the bar. An argument then ensued between Michael and Gardner during which Ricky Blake called Volkman a "bitch." Gardner turned to Blake and said, "Leave her out of this, she has nothing to do with this." Blake and Gardner then began to fight. Hense and Volkman did not know who started the fight, but Michael Castiglione testified that Blake initially placed both of his hands on Gardner's chest and pushed him backward. Gardner took off his blue nylon windbreaker and fought back. Neither Hense nor Volkman saw a knife in Blake's possession, and Hense denied that he had said otherwise to the police. Officer Bartosik, however, testified that Hense told him that Ricky Blake had a knife when he was fighting with Gardner. Gardner, Hense, and Volkman were unarmed. Gardner threw Blake down, then fought with him on the ground. Gardner was 6 feet 2 inches tall and weighed approximately 190 pounds; Blake, as has been noted previously, was 5 feet 10 inches tall and weighed between 160 and 180 pounds.

Hense and Volkman testified further that when Hense attempted to intervene in the fight between Gardner and Blake, Michael Castig-

lione pulled out a knife with a 3- to 4-inch blade, held it to his chest and said, "Just stay out of it or you will get what is coming to you." Hense stated that John Castiglione, who had been watching the fight closely and was holding a similar knife in his right hand, stepped forward and, without provocation, repeatedly stabbed Gardner in the lower left back, the left side of the chest, and the left arm underneath the arm pit when it became apparent that Blake was losing the fistfight with Gardner. Hense yelled, "Tom, they've got knives!" and ran for help by pounding on the doors of nearby homes, but no one answered. John stopped stabbing Gardner, and Michael began to punch him. John then attacked Gardner with his knife and pushed Volkman away when she tried to protect her boyfriend. Volkman again attempted to intervene, but Ricky Blake threw her to the ground saying, "No you don't, bitch," and began beating her.

Both Hense, who had returned to the scene, and Volkman saw John and Michael Castiglione stabbing Gardner. Two police officers who interviewed Volkman at 6:30 and 9 a.m. on November 13, 1983, however, testified that she never indicated that she had seen either John or Michael Castiglione stab Thomas Gardner. According to these officers, Volkman, who was hysterical, stated only that she had been knocked down and that she did not know that Gardner had been stabbed until after the Castigliones and Ricky Blake had left. Hense ran to a telephone booth at 59th Street and Talman Avenue and called the police. Finally, the Castigliones ceased their assault on Gardner, who stood up and walked a few feet toward Volkman. He told her that he had been stabbed and that she should call an ambulance. He then collapsed.

Volkman ran to the same telephone booth Hense had used and also called the police. When she came back, she asked John Castiglione, who was leaving the scene, why he had stabbed Gardner, and he merely extended his arms as if to push her away. Volkman ran to Gardner's side, but she saw that he already was dead. There was blood all over him, including his legs. At that time he was wearing brown corduroy pants and black shoes, but he was naked from the waist up. He was not wearing the blue windbreaker or yellow shirt Volkman had seen on him earlier.

Testifying in his own behalf, Michael Castiglione denied that either he or his brother had stabbed Thomas Gardner. Michael said he assisted Ricky Blake only after he saw that Gardner had overpowered him and was kicking him in the face. Michael said he hit Gardner because he was kicking Blake in the face. Gardner then started to run south on Washtenaw. Ricky chased and when he caught him, they

fought again. After some blows Gardner ran from the fight, and when he met John in the middle of the street, they exchanged blows. When Gardner reached the other side of the street, "he just laid down." Ricky then began kicking Gardner, and after noticing that Gardner was covered with blood, Michael saw Ricky closing a knife. Michael, however, failed to mention the knife when he was interviewed by an assistant State's Attorney later that morning. Michael testified further that he saw Blake kicking Gardner after he (Gardner) had been stabbed. Although Michael knew that Gardner had been seriously injured, he did not notify the police. John, according to Michael, was highly intoxicated.

Officer Richard Shore, responding to a report of a disturbance, observed John Castiglione walking north on Washtenaw immediately north of 60th Street. He had blood on his face, hands, and chest. Shore drove south to the intersection of Washtenaw and 60th street, where he saw a woman leaning over a body, crying and screaming. The victim, Thomas Gardner, was partially bare-chested, and there was blood on his chest and hands. Shore turned around and drove north on Washtenaw until he again saw Castiglione and ordered him to halt. Castiglione looked at Shore and attempted to run. He was staggering and appeared to be highly intoxicated. Castiglione tried to hide in some bushes, but Shore pulled him out and demanded to know what had happened. He denied any knowledge of the stabbing. Shore arrested him and took him back to the scene of the crime.

Upon their arrival Judy Volkman pointed at John Castiglione and shouted, "Here he is. He's one of them. He's one of them." When Shore asked her what had happened, Volkman responded, "[H]e was one of them who attacked him [Gardner] with a knife." She added, "He has a brother who was also involved in it." Shore asked Volkman where the brother lived, but she could not give him an exact address because she was excited and incoherent. She just pointed north. John Castiglione told Shore where he lived. Hense also identified John Castiglione and told Shore that his brother (Michael) was involved. On cross-examination, Shore stated that after Gardner's body was removed, Volkman stated that John Castiglione possibly had a knife on him. No weapons were found at the scene, which was not searched until after daybreak.

A blue jacket was found in front of 6024 South Washtenaw; a yellow pullover shirt and a red and white bandanna were discovered in the area of 6028 South Washtenaw. Blood on the shirt could have been a mixture of defendants' blood, but it did not match Gardner's blood. Drops of blood were found on both sides of the 6000 block on

South Washtenaw and in the street. Samples of blood taken from 6014 and 6023 South Washtenaw matched Gardner's blood; a sample taken from 6032 South Washtenaw could have come from Gardner or either defendant.

Michael Castiglione was arrested at approximately 6 a.m., hiding in the basement of his father's home at 5922 South Washtenaw. There were slight wounds and scarring on his hands, but his face was clean. The police later searched his bedroom and found a knife with a 3- to 4-inch blade which appeared to have blood stains on it. The knife, which Hense and Volkman said was identical in appearance to the ones they had seen in defendants' possession, was found in a sheath strapped to a belt in a pair of blue jeans.[1] Subsequent analysis of the knife revealed no identifiable trace materials. The police also seized Michael's clothing and recovered Gardner's blood-stained blue windbreaker. The blood on the windbreaker could have been Gardner's or either defendant's. Expert serological analysis of various articles of clothing taken from both defendants disclosed the presence of blood and blood enzymes that could have come from Thomas Gardner.

Gardner died as a result of massive bleeding caused by multiple stab wounds to the left part of his chest, his left arm, his right arm, and his left leg. One stab wound punctured his left lung and another severed a major artery in his left leg. Either wound could have caused his death. There also were abrasions and bruises on his face, neck, chest, and the back of his hands. Gardner's wounds could have been inflicted by the knife recovered from Michael Castiglione's bedroom. The wounds to the left arm were consistent with wounds a person would sustain in defending against a knife attack.

I

■ Defendants initially contend that the trial court erred in refusing to consider the defense of justifiable use of force and the lesser included offense of voluntary manslaughter. We disagree.

Section 7—1 of the Criminal Code of 1961 provides:

"A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force. However, he is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force

---

[1]In his testimony Michael said that it was his knife but that he used it only at work and was not carrying it that evening.

is necessary to prevent imminent death or great bodily harm to himself or another * * *." Ill. Rev. Stat. 1983, ch. 38, par. 7—1.

In the case at bar, neither David Hense nor Judy Volkman knew who started the fight between Ricky Blake and Thomas Gardner. Michael Castiglione, however, testified that the fight began when Blake placed both of his hands on Gardner's chest and pushed him backward. There is no evidence that Gardner initiated the struggle or provoked Blake into hitting him. Under these circumstances, it is apparent that Blake was the aggressor in the conflict that resulted in Gardner's death.[2]

Under the criminal code, the defense of justifiable use of force is not available to a person who initially provokes the use of force against himself,[3] unless "[s]uch force is so great that he reasonably believes that he is in imminent danger of death or great bodily harm, and that he has exhausted every reasonable means to escape such danger other than the use of force which is likely to cause death or great bodily harm to the assailant," or "[i]n good faith, he withdraws from physical contact with the assailant and indicates clearly to the assailant that he desires to withdraw and terminate the use of force, but the assailant continues or resumes the use of force." (Ill. Rev. Stat. 1983, ch. 38, par. 7—4(c); *People v. Sloan* (1986), 111 Ill. 2d 517, 521-22, 490 N.E.2d 1260; *People v. Walker* (1978), 58 Ill. App. 3d 535, 374 N.E.2d 880.) In our judgment, neither exception is applicable here.

It is questionable whether defendants reasonably could have believed that Ricky Blake was in imminent danger of death or great bodily harm and that he had exhausted every practicable means of escape from such danger.[4] Even assuming otherwise, however, defendants reacted with excessive force in stabbing an unarmed man 16 times. Clearly defendants could have taken measures short of killing Gardner that would have protected Blake.

■ A person who intervenes on behalf of an aggressor who is in

---

[2]It is immaterial that Gardner may have been the aggressor in the earlier incidents which did not involve Ricky Blake. See *People v. Wilson* (1972), 3 Ill. App. 3d 481, 485-86, 278 N.E.2d 473.

[3]Defendants do not dispute the proposition that their right to use force in defense of Blake is limited to Blake's right to defend himself. See generally *People v. Jordan* (1985), 130 Ill. App. 3d 810, 812, 474 N.E.2d 1283 (and the cases cited therein). See also *People v. Carmack* (1977), 50 Ill. App. 3d 983, 986-87, 366 N.E.2d 103.

[4]We note that Michael Castiglione denied that either he or his brother had stabbed Thomas Gardner. John Castiglione did not testify. Thus, there was no defense testimony on the basis of which the trial court could have determined that defendants had acted in defense of Ricky Blake.

imminent danger of death or great bodily harm and has exhausted every reasonable means to escape such danger may not use more force than is minimally required to prevent death or great bodily harm. (*People v. Jordan* (1985), 130 Ill. App. 3d 810, 812, 474 N.E.2d 1283; *People v. Feierabend* (1981), 98 Ill. App. 3d 731, 740-41, 424 N.E.2d 765, *aff'd in part, rev'd in part on other grounds* (1982), 91 Ill. 2d 561, 435 N.E.2d 1144; *People v. Walker* (1978), 58 Ill. App. 3d 535, 538-39, 374 N.E.2d 880; *People v. Carmack* (1977), 50 Ill. App. 3d 983, 986-87, 366 N.E.2d 103.) Defendants clearly exceeded that minimum.

■■ ■ Moreover, there is no evidence that defendants came to Blake's aid after Blake withdrew from physical contact with Gardner. Indeed, according to Michael Castiglione's testimony, it was Blake who chased Gardner and resumed the fight when Gardner tried to run away. We find no error in the trial court's refusal to consider the defense of justifiable use of force. Nor do we find any error in the court's refusal to consider the lesser included offense of voluntary manslaughter.

Section 9—2(b) of the Criminal Code provides that "[a] person who intentionally or knowingly kills an individual commits voluntary manslaughter if at the time of the killing he believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles stated in Article 7 of this Code, but his belief is unreasonable." (Ill. Rev. Stat. 1983, ch. 38, par. 9—2(b).) For the reasons set forth above, defendants would not have been justified in stabbing to death Thomas Gardner even if they had reason to believe that Ricky Blake was in imminent danger of death or great bodily harm and that he had exhausted every practicable means of escape from such danger. The force used was excessive. Accordingly, there was no basis on which the court could have found defendants guilty of voluntary manslaughter under section 9—2(b) of the Criminal Code. *People v. Sloan* (1986), 111 Ill. 2d 517, 522, 490 N.E.2d 1260; *People v. Feierabend* (1981), 98 Ill. App. 3d 731, 737-38, 424 N.E.2d 765, *aff'd in part, rev'd in part on other grounds* (1982), 91 Ill. 2d 561, 435 N.E.2d 1144.

Section 9—2(a) of the Code provides that "[a] person who kills an individual without lawful justification commits voluntary manslaughter if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by *** the individual killed." (Ill. Rev. Stat. 1983, ch. 38, par. 9—2(a).) "Serious provocation" is defined by the statute as "conduct sufficient to excite an intense passion in a reasonable person." (Ill. Rev. Stat. 1983, ch. 38,

par. 9—2(a).) Such conduct includes "substantial physical injury or assault, mutual quarrel or combat, illegal arrest, and adultery with the offender's spouse." Ill. Ann. Stat., ch. 38, par. 9—2, Committee Comments, at 393 (Smith-Hurd 1979); *People v. Crews* (1967), 38 Ill. 2d 331, 335, 231 N.E.2d 451.

■ Defendants argue that the mutual combat between Ricky Blake and Thomas Gardner should have been considered by the trial court as "serious provocation" under the statute. We reject this argument for two reasons: First, the provocation in question (the fistfight between Blake and Gardner) did not involve either defendant. A defendant may not derivatively rely on an intense passion allegedly provoked in a third person to reduce an offense from murder to voluntary manslaughter. (*People v. Feierabend* (1981), 98 Ill. App. 3d 731, 738, 424 N.E.2d 765, *aff'd in part, rev'd in part on other grounds* (1982), 91 Ill. 2d 561, 435 N.E.2d 1144.) Second, even assuming that defendants were provoked by the fight between Blake and Gardner or by the earlier brawls at the tavern and the gas station, they did not fight the victim on equal terms.

■ Mutual combat has been defined as one in which both parties enter willingly, or in which two persons, upon a sudden quarrel, and in hot blood, mutually fight upon equal terms. (*People v. Matthews* (1974), 21 Ill. App. 3d 249, 253, 314 N.E.2d 15.) A slight provocation will not be adequate since the provocation must be proportionate to the manner in which the accused retaliated, and, therefore, if an accused on a slight provocation attacked the deceased with violence out of all proportion to the provocation and killed him, the crime is murder. (21 Ill. App. 3d 249, 253, 314 N.E.2d 15.) This is especially true if the homicide was committed with a deadly weapon. (21 Ill. App. 3d 249, 253, 314 N.E.2d 15.) In the case at bar, defendants stabbed an unarmed man 16 times. This is not what the law contemplates as "mutual combat."

■ John Castiglione argues in the alternative that the trial court should have considered whether his intoxication negated the mental state required of murder. Again, we must disagree.

To raise voluntary intoxication as a defense to a charge of murder so as to reduce the offense to manslaughter, the accused must show that the intoxication was so extreme as to suspend entirely the power of reason. (Ill. Rev. Stat. 1983, ch. 38, par. 6—3(a); *People v. Proper* (1979), 68 Ill. App. 3d 250, 254, 385 N.E.2d 882.) The evidence here shows that John Castiglione attacked Thomas Gardner with a knife when it appeared to him that Gardner had overpowered Ricky Blake. After Gardner was killed, John Castiglione attempted to elude the po-

lice by hiding in some bushes and, upon his apprehension, he denied any knowledge of what had happened. He later told the police where his brother Michael lived. This conduct demonstrated considerable presence of mind. Where, as here, the evidence indicates that defendant acted with any purpose or rationality, voluntary intoxication is not an available defense. *People v. Nichols* (1981), 96 Ill. App. 3d 354, 359, 420 N.E.2d 1166.

Upon our review of the record, we are satisfied that the trial court did not err in refusing to consider either the defense of justifiable use of force or the lesser included offense of voluntary manslaughter.

## II

■■ Defendants next contend that the trial court improperly restricted their cross-examination of prosecution witnesses.

On cross-examination, Judy Volkman testified that she did not know who started the fight between Ricky Blake and Thomas Gardner. She volunteered, however, that she had known Gardner for years and did not believe that he was the type of person who would have struck anyone first. Defense counsel then attempted to question Volkman regarding her knowledge of Gardner's prior convictions for aggravated battery and burglary. The State's objections to this line of questioning were sustained.

When the theory of self-defense is raised, the victim's aggressive and violent character is relevant to show who is the aggressor, and the defendant may show it by appropriate evidence, including convictions for crimes of violence, regardless of when he learned of it. (*People v. Lynch* (1984), 104 Ill. 2d 194, 200, 470 N.E.2d 1018.) This rule has no applicability in the case at bar, however, where defense testimony established that Ricky Blake, not Thomas Gardner, was the aggressor in the fight that resulted in Gardner's death. Assuming that evidence of Gardner's prior convictions for violent crimes (which would not include burglary) was admissible to show his belligerent character, such evidence clearly would have been cumulative.

■■ Defendants next complain of the court's restriction of their cross-examination of Judy Volkman regarding her alleged use of phencyclidine (PCP). On cross-examination, Volkman denied that she had used PCP on the date of the offense or that she was feeling the effects of PCP at that time. No evidence was offered to impeach this testimony. Defense counsel also asked Volkman whether she frequently used PCP. She answered, "Not no more I don't." The court sustained the State's objection to this question and ordered the an-

swer stricken. Defendants now argue that the court improperly foreclosed their inquiry into Volkman's alleged use of drugs. We disagree.

Although evidence that a witness ingested drugs at or near the time of the crime is admissible to show that her ability to observe, recollect, and narrate has been impaired (see *People v. Phillips* (1970), 126 Ill. App. 2d 179, 261 N.E.2d 469), the question found to be objectionable in this case did not focus upon Volkman's use of drugs at or near the time of the offense and therefore was improper. We reiterate that counsel was allowed to ask Volkman whether she had used PCP on the date of the offense and whether she was under the influence of PCP at that time and her denials were not impeached.

Lastly, defendants complain of the trial court's restriction of their cross-examination of David Hense regarding his "convictions" for battery, disorderly conduct, and resisting arrest. Hense was placed on court supervision for these offenses while defendants' cases were pending. Defendants argue that the court should have allowed them to question Hense on these matters to show a possible bias or motive to give testimony favorable to the State in exchange for lenient treatment. We note, however, that at trial this evidence was offered by defendants solely to impeach Hense and not to show bias or motive to testify falsely. Moreover, the asserted error was not raised in defendants' post-trial motion. Under these circumstances, the error alleged has been waived.

## III

Finally, defendants contend that they were not proved guilty beyond a reasonable doubt. We disagree.

Defendants argue that Judy Volkman was impeached by evidence that she had failed to tell the police on two occasions that she had seen both defendants stab the victim. Volkman, however, was interviewed shortly after her boyfriend was murdered and at times when, according to the police, she was hysterical and extremely upset. Of greater importance is that Volkman told the first officer who arrived at the scene that John Castiglione was "one of them who attacked [Gardner] with a knife," and that his brother also was involved. Although David Hense's testimony that Ricky Blake was unarmed was impeached by a contrary statement that he gave to the police, we note that his testimony that he saw both defendants attack Gardner with knives was unimpeached.

We attach no particular significance to the fact that no weapon was found in John Castiglione's possession upon his arrest. He could have thrown the knife away before the police arrived, or his brother

could have taken it with him when he fled from the scene, which, we might add, was not searched until daybreak. Although no identifiable trace materials were found on the knife recovered from Michael Castiglione's bedroom, it is clear that Michael had ample opportunity to clean any blood off of the weapon before his arrest.

Defendants also argue that the trail of Gardner's blood found at the scene was inconsistent with the eyewitnesses' testimony that the stabbing occurred at one location. We have examined this argument and find no merit in it. Both Judy Volkman and David Hense were absent from the scene of the crime for brief periods, and it is possible that Gardner himself was able to move a few feet from where his body ultimately was found or that his blood dripped onto the sidewalk and street from the defendants' hands or the knives that were used. We note in this regard that there was uncontradicted evidence that when John Castiglione was arrested a short distance from Gardner's body, his face, hands, and chest were covered with blood.

Michael Castiglione's testimony that neither he nor his brother stabbed Thomas Gardner was contradicted by the physical evidence. Expert analysis of articles of clothing taken from both defendants disclosed the presence of blood and blood enzymes that could have come from Gardner, and Gardner's blood-soaked windbreaker was found in Michael Castiglione's bedroom. Moreover, although he testified that Ricky Blake was the person who stabbed Gardner, he admitted that he did not tell this to the assistant State's Attorney who interviewed him after the occurrence.

Upon our review of the record, we are satisfied that both defendants were proved guilty beyond a reasonable doubt of murder. Accordingly, the judgments of the circuit court of Cook County are affirmed.

Affirmed.

LORENZ and MURRAY, JJ., concur.