THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
GEORGE J. AMBRO, Defendant-Appellant.

Second District   No. 2—85—0930

Opinion filed March 11, 1987.

2

LINDBERG, P.J., concurring in part and dissenting in part.

Vincent C. Argento, of Robert A. Chapski, Ltd., of Elgin, for appellant.

Robert J. Morrow, State's Attorney, of Geneva (William L. Browers and Martin P. Moltz, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE NASH delivered the opinion of the court:

After a jury trial, defendant, George Ambro, was convicted of murdering (Ill. Rev. Stat. 1985, ch. 38, par. 9—1) his wife, Ruth Ambro, and sentenced to a term of 20 years' imprisonment. On appeal, defendant contends (1) the trial court erred in refusing to instruct the jury on the offense of voluntary manslaughter based on provocation, (2) defendant was not proved guilty of murder beyond a reasonable doubt, and (3) the trial court erred in refusing to permit a psychiatrist to testify regarding defendant's mental state.

Defendant and Ruth Ambro were married on May 25, 1974, and, at the time of the killing on March 28, 1985, the couple had two children, Jocelyn and Bethany, ages six and two years old. In 1978, the couple began experiencing marital difficulties and Ruth attempted suicide. In June 1984, the couple separated until Ruth returned to their Elgin residence two weeks later. During late 1984 and early 1985, the couple's marital problems worsened. Defendant testified that the couple did not have marital relations until after December 1984, and Ruth would stay out at night until 4:30 a.m. without explanation. He stated he became suspicious of her activities when he observed that Ruth was wearing different types of underwear and discovered she had purchased birth control pills.

In January 1985, the couple joined a marital counselling group, and on March 20, 1985, Ruth informed the group that she no longer loved defendant and was going to divorce him. Defendant stated that he attempted suicide shortly thereafter. On March 26, 1985, Ruth met with an attorney and scheduled a meeting for March 29, 1985, to sign a petition for dissolution of the marriage.

Defendant testified that he returned home from work on the evening of March 28, 1985, at approximately 5:30 p.m. and Ruth immediately began bickering. Shortly thereafter, David Gordon, a police officer with the Kane County sheriff's police department and a friend of the couple, arrived at the residence. Defendant stated he knew Gordon was assigned to the civil process division and asked Gordon several times whether he had come to serve defendant with divorce papers. Ruth had told defendant she had seen an attorney several days before and wondered why the divorce papers had not yet arrived.

After Gordon left, the couple had dinner and argued about Ruth's treatment of the children. Defendant accused Ruth of mistreating Bethany by hitting her and not feeding her properly and asked Ruth if she was taking her frustration toward defendant out on the child. Defendant stated that when Ruth picked up Bethany's high chair and threw it back about three feet, he became very upset and confused.

Defendant testified further that he then put the dinner dishes in the kitchen and the couple did not speak with each other until 7:30 p.m., when defendant called his mother to say goodnight to Jocelyn, their oldest daughter, who was visiting the grandmother. When defendant found out the child could not come to the phone because she was taking a bath and hung up, Ruth accused him of not allowing her to talk to Jocelyn.

After Bethany was put to bed, the couple continued their argument. Defendant stated he was cleaning the kitchen counter and was holding two knives in his hand when his wife, who was on the living room sofa, told him that he had no right to complain about her handling of the children because he "had no right to the children." She then called defendant an alcoholic and told him that he did not love the children and that she was going to take them away from him. Defendant testified he could not describe his feelings at that point and had never had such feelings before. He went to the living room, kneeled beside Ruth and asked her what he could do to restore their relationship. Ruth said, "I have another man and when we make love I feel like it was." She then said, "I know you want to kill me. Pull that knife and make it easy for me." Defendant then stabbed Ruth with a knife, testifying that he had no conscious knowledge of doing so or an intent to stab her. He immediately called the police, but Ruth never regained consciousness and died soon after being brought to the hospital. At trial, medical testimony established that the wife died from a single stab wound through the heart.

Defendant presented witnesses who testified to his reputation in the community for peacefulness and relating to the couple's marital

problems. He attempted to present testimony by Dr. Lyle Rossiter, a psychiatrist who had examined defendant after his arrest, on defendant's mental state at the time he killed his wife, but the court granted the State's motion to exclude the testimony.

Defendant tendered a jury instruction defining the offense of manslaughter based on provocation, but the trial court sustained an objection by the State and refused to submit it to the jury, which was instructed only on the charge of murder. After deliberations, the jury convicted defendant of murder and he was sentenced to a term of 20 years' imprisonment.

We consider first defendant's contention that the trial court erred in refusing to instruct the jury on the offense of voluntary manslaughter based on provocation.

Defendant argues that it was error to refuse his tendered instruction based on section 9—2(a) of the Criminal Code of 1961 (Code) (Ill. Rev. Stat. 1985, ch. 38, par. 9—2(a)), which defines voluntary manslaughter. That section states:

> "A person who kills an individual without lawful justification commits voluntary manslaughter if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by:
>
> (1) The individual killed ***.
> ***
>
> Serious provocation is conduct sufficient to excite an intense passion in a reasonable person."

Defendant asserts that the evidence warranted submission of the manslaughter instruction to the jury.

In resolving this issue, we must first determine whether the evidence relating to the conduct of Ruth Ambro prior to the killing is, if believed by the jury, the type of provocation contemplated under section 9—2(a) of the Code. In *People v. Matthews* (1974), 21 Ill. App. 3d 249, 314 N.E.2d 15, *appeal denied* (1974), 57 Ill. 2d 605, the court characterized this requirement by stating:

> "Passion on the part of the slayer, no matter how violent will not relieve him from liability for murder unless it is engendered by a provocation which the law recognizes as being reasonable and adequate. If the provocation is not sufficient the crime is murder." (21 Ill. App. 3d 249, 253.)

The general rule in Illinois is that the only categories of provocation which are considered sufficiently serious to reduce the crime of murder to voluntary manslaughter are substantial physical injury or assault, mutual quarrel or combat, illegal arrest, and adultery with the

offender's spouse. (*People v. Fausz* (1983), 95 Ill. 2d 535, 539, 449 N.E.2d 78; *People v. Strong* (1979), 79 Ill. App. 3d 17, 24, 398 N.E.2d 216; *People v. Hammock* (1979), 68 Ill. App. 3d 34, 39, 385 N.E.2d 796.) Mere words, however aggravated, abusive, opprobrious, or indecent, are not sufficient provocation. (*People v. Neal* (1983), 112 Ill. App. 3d 964, 967, 446 N.E.2d 270; *People v. Matthews* (1974), 21 Ill. App. 3d 249, 253, 314 N.E.2d 15, *appeal denied* (1974), 57 Ill. 2d 605.) Moreover, adultery by a spouse has generally been limited to those instances where the parties were discovered in the act of adultery or immediately before or after its commission. *People v. Middleswart* (1984), 124 Ill. App. 3d 35, 39, 463 N.E.2d 1050; *People v. Jenkins* (1975), 30 Ill. App. 3d 1034, 1038, 333 N.E.2d 497, *appeal denied* (1975), 61 Ill. 2d 599; *People v. Wax* (1966), 75 Ill. App. 2d 163, 182, 220 N.E.2d 600, *cert. denied* (1967), 387 U.S. 930, 18 L. Ed. 2d 991, 87 S. Ct. 2051.

An apparent exception to these general rules, based on verbal revelations of infidelity and other conduct, has been recognized in two Illinois cases in which convictions for voluntary manslaughter were affirmed. In *People v. Ahlberg* (1973), 13 Ill. App. 3d 1038, 301 N.E.2d 608, *appeal denied* (1974), 55 Ill. 2d 602, the defendant's killing of his wife was the culmination of a series of events. In that case, defendant's wife moved out of the house with the children without informing her husband, and he looked for her for several days. When the victim finally contacted him, she informed the defendant that she was getting a divorce because she was tired of "being the nice school teacher's wife," that he had never satisfied her sexually, and that she had found an older man who could love her and her two children more than he could. (13 Ill. App. 3d 1038, 1039.) Under these circumstances, the reviewing court considered that it would be a "direct refutation of logic and a miscarriage of justice" to follow the rule that mere words are insufficient to cause provocation serious enough to support a conviction for manslaughter. 13 Ill. App. 3d 1038, 1041.

In *People v. Carr* (1980), 91 Ill. App. 3d 512, 414 N.E.2d 1108, *cert. denied* (1981), 454 U.S. 848, 70 L. Ed. 2d 136, 102 S. Ct. 167, defendant and his wife had engaged in frequent arguments in the six months preceding the shooting, most of them over the husband's suspicions of infidelity by her. Defendant's wife then moved out of their home, and defendant informed a cousin of the victim that he would kill his wife if she tried to remove any furniture from their home. The wife returned two weeks later to remove some furniture. The couple began arguing, and, when the wife told him, "At least now I have a real man" (91 Ill. App. 3d 512, 514, 414 N.E.2d 1108), defendant shot

her. The appellate court cited *Ahlberg* with approval and concluded that the evidence was sufficient to support defendant's conviction for voluntary manslaughter. 91 Ill. App. 3d 512, 517-18.

In *People v. Harris* (1984), 123 Ill. App. 3d 899, 463 N.E.2d 1030, *appeal denied* (1984), 101 Ill. 2d 571, the court reviewed the two cases and noted that both *Ahlberg* and *Carr* involved situations where the revelation of adultery was one of a series of provoking statements or circumstances. The court then determined that "these cases do not support the proposition that Illinois has adopted the more liberal approach concerning verbal communication of the fact of adultery as provocation." (123 Ill. App. 3d 899, 905, 463 N.E.2d 1030.) We agree with that conclusion, since neither *Ahlberg* nor *Carr* were based on mere verbal conduct. In both cases, there was a history of ongoing marital discord, a wife who evidenced an intent to permanently leave her husband, insulting remarks concerning the husband's masculinity, and an announcement of adultery by the wife.

In the present case, defendant and his wife had been experiencing marital difficulties for seven years and, as in *Carr*, defendant began to suspect her of infidelity shortly before he killed her. One week before her death, Ruth told the couple's marital-counselling group and defendant that she no longer loved her husband and was going to seek a divorce. She then contacted an attorney to draft a petition for dissolution of the marriage and informed defendant of her actions. On the evening of the killing, defendant became upset over his wife's treatment of Bethany and her threats of seeking a divorce, and the couple engaged in repeated arguments during which the wife implied that defendant was not the father of her children, called him an alcoholic, and told him she was going to take the children when she left him. When defendant knelt beside his wife and asked how he could restore their relationship, she informed him of her adultery and then goaded him to kill her.

These facts closely parallel the series of events found to constitute serious provocation in *Ahlberg* and *Carr* and, in our view, go beyond the provocation elements in those cases, since the victim here goaded defendant to kill her. On these facts, we conclude the present case falls within the exception recognized in *Ahlberg* and *Carr* and find that the wife's conduct was the type of provocation which Illinois law recognizes as sufficiently serious, if believed by the jury, to reduce the crime of murder to voluntary manslaughter.

We note that the court in *Harris* did not find "insignificant" the facts that both *Ahlberg* and *Carr* involved appeals from voluntary-manslaughter convictions which would have been reversed had the

court found that the evidence did not support the voluntary-manslaughter instruction. (*People v. Harris* (1984), 123 Ill. App. 3d 899, 905, 463 N.E.2d 1030.) We consider the carefully reasoned exception established in *Ahlberg* and *Carr* is not limited to cases involving voluntary-manslaughter convictions and that it necessarily applies to the present case, where the appeal is premised upon the refusal of the trial court to submit a voluntary-manslaughter instruction to the jury.

▮▮ ▮ We conclude that defendant presented sufficient evidence to warrant giving the instruction in this case. The instruction must be given where there is some evidence in the record which would reduce the crime to voluntary manslaughter. (*People v. Coleman* (1984), 124 Ill. App. 3d 285, 289, 464 N.E.2d 706, *appeal denied* (1984), 101 Ill. 2d 569; *People v. Santiago* (1982), 108 Ill. App. 3d 787, 802, 439 N.E.2d 984, *appeal denied* (1982), 91 Ill. 2d 556.) Here, the trial judge stated that, if the Illinois case law did not forbid him from doing so, he would have given the instruction because the evidence showed defendant acted "during a period of sudden and intense passion." Although we have concluded that the trial judge erred in his interpretation of the case law on provocation, we agree with him that there was sufficient evidence of provocation in this case to support defendant's theory of defense. We find the trial court erred in refusing to submit the tendered instruction on voluntary manslaughter to the jury.

Defendant has also urged that he was not proved guilty of murder beyond a reasonable doubt. As this case must be retried, we will only note that there was sufficient evidence which, if believed by a jury under adequate instructions as to the law, to sustain a conviction.

We will consider defendant's contention that the trial court erred in refusing to permit a psychiatrist to testify as to defendant's mental condition at the time of the offense as that issue may arise again on retrial.

▮▮ We conclude that the court's rejection of Dr. Rossiter's testimony did not constitute reversible error. Defendant claims that the sole issue at trial was whether he was acting under a sudden and intense passion at the time he stabbed his wife. Such a narrow characterization is misleading as the jury was charged with deciding whether he had committed murder. As stated above, one of the elements of murder is intent or mental state. The questions of defendant's mental condition at the time of the crime is a question of fact to be determined by the trier of fact. *People v. Ford* (1968), 39 Ill. 2d 318, 320, 235 N.E.2d 576; *People v. Ferro* (1970), 120 Ill. App. 2d 259, 256 N.E.2d 886, 887.

Our decision today is consistent with that of the court in *People v.*

8

*Aliwoli* (1976), 42 Ill. App. 3d 1014, 356 N.E.2d 891. We reject defendant's attempt to distinguish that case from the present one. In *Aliwoli*, the court addressed the propriety of introducing psychiatric evidence regarding the issue of whether defendant had the requisite criminal intent to commit attempted murder. The reviewing court held that introducing "the testimony of the psychiatrist would not only usurp the province of the jury, but it would probably not have persuaded them in resolving such issue of fact." 42 Ill. App. 3d 1014, 1021, 356 N.E.2d 891. Accord, *People v. Slago* (1978), 58 Ill. App. 3d 1009, 374 N.E.2d 1270.

Defendant directs our attention to *People v. Goolsby* (1977), 45 Ill. App. 3d 441, 359 N.E.2d 871, where the court held that medical testimony may be admitted in order to assist the trier of fact even though expert opinion may coincide with an ultimate issue of fact. (45 Ill. App. 3d 441, 447, 359 N.E.2d 871.) That proposition is correct in cases where the expert testifies to facts requiring scientific knowledge not within the common knowledge of the jury. (See *People v. Ciucci* (1956), 8 Ill. 2d 619, 137 N.E.2d 40, *aff'd* (1958), 357 U.S. 924, 2 L. Ed. 2d 1375, 78 S. Ct. 1367; *People v. Prather* (1985), 138 Ill. App. 3d 32, 485 N.E.2d 430.) On the other hand, expert opinions may not be admitted on matters of common knowledge unless the subject is difficult to comprehend and explain. (*People v. Johnson* (1981), 97 Ill. App. 3d 1055, 1069, 423 N.E.2d 1206, *cert. denied* (1982), 455 U.S. 951, 71 L. Ed. 2d 667, 102 S. Ct. 1457.) From the facts, as previously discussed, we conclude that the jury could have arrived at its decision based on its knowledge without the help of expert testimony.

Accordingly, the judgment of the trial court is reversed and the cause remanded for a new trial.

Reversed and remanded.

HOPF, J., concurs.

PRESIDING JUSTICE LINDBERG, concurring in part and dissenting in part:

I concur in the majority opinion that the rejection of the psychiatrist's testimony was not reversible error. Additionally, I would hold that there was sufficient evidence to support the jury's verdict of murder beyond a reasonable doubt.

However, I dissent in the majority holding that it was error not to instruct the jury on a verdict of voluntary manslaughter. The majority, apparently, has chosen to follow the *Ahlberg* "miscarriage of jus-

tice" standard. (*People v. Ahlberg* (1973), 13 Ill. App. 3d 1038, 301 N.E.2d 608.) *Carr*, of course, simply followed the analysis of *Ahlberg* (*People v. Carr* (1980), 91 Ill. App. 3d 512, 414 N.E.2d 1108, *cert. denied* (1981), 454 U.S. 848, 70 L. Ed. 2d 136, 102 S. Ct. 167), both of which were rejected by *Harris* (*People v. Harris* (1984), 123 Ill. App. 3d 899, 463 N.E.2d 1030) as indicative of the adoption of a more liberal interpretation of what constitutes serious provocation in Illinois.

"Serious provocation" is a legal standard. It is defined in *People v. Crews* (1967), 38 Ill. 2d 331, 335, as including substantial physical injury or assault, mutual quarrel or combat, illegal arrest, and *adultery with the offender's spouse*. I believe my disagreement with the majority centers upon whether the victim's provocation obtains legal recognition under the latter "adultery" standard. Certainly, I do not disagree that, quantitatively, there is "some evidence" contained in defendant's testimony concerning what the victim allegedly told him which many would consider provocative, but I disagree that the words attributed to the victim meet the "adultery" standard so as to be legally recognized as "serious provocation" as defined by our supreme court. It is my view that "words alone [even those that carry messages of adultery] are insufficient evidence of provocation." *People v. Arnold* (1974), 17 Ill. App. 3d 1043, 309 N.E.2d 89, 92.

I believe a distinction can be drawn between *Ahlberg* and *Carr* and the case at bar, as those cases were *appeals from convictions* for voluntary manslaughter which were affirmed. Here the question is whether it was error as a matter of law to refuse to give the jury the voluntary-manslaughter instruction. In *Ahlberg* the court applied a "miscarriage of justice" standard, and *Carr* simply followed *Ahlberg*. The *Ahlberg* court recognized the general rule while declining to apply it to the defendant, who dragged his wife from their home, beat, kicked, and stomped her, causing injuries from which she later died. The *Ahlberg* court said:

> "To follow unequivocally the rule that 'mere words are insufficient to cause the provocation necessary to support a finding of guilt of voluntary manslaughter['] *would be in keeping with precedent and an established rule*; however, it would be a direct refutation of logic and a miscarriage of justice." (Emphasis added.) 13 Ill. App. 3d 1038, 1041, 301 N.E.2d 608.

I agree with the *Harris* court that "these cases do not support the proposition that Illinois has adopted the more liberal approach concerning verbal communication of the fact of adultery as provocation." *People v. Harris* (1984), 123 Ill. App. 3d 899, 905, 493 N.E.2d 1030; see *People v. Wax* (1966), 75 Ill. App. 2d 163, 220 N.E.2d 600.

It is my view that there are both qualitative and quantitative dimensions to the voluntary-manslaughter analysis. The qualitative analysis asks whether the nature of the victim's conduct is *legally recognized* in Illinois as provocative. Our supreme court has concluded that a victim's conduct which is legally recognized as provocative includes substantial physical injury or assault, mutual quarrel or combat, illegal arrest, and adultery with the offender's spouse. Ill. Ann. Stat., ch. 38, par. 9—2, Committee Comments, at 393 (Smith-Hurd 1979); *People v. Fausz* (1983), 95 Ill. 2d 535, 539, 449 N.E.2d 78; *People v. Castiglione* (1986), 150 Ill. App. 3d 459, 501 N.E.2d 923.

In sum, I believe that Illinois case law teaches us that, with the exception of *Ahlberg* and *Carr*, if, quantitatively, there is some evidence satisfying the qualitative legal standard of provocation, then the instruction on voluntary manslaughter must be given. But, if the "some evidence," from a quantitative analysis, is evidence of conduct that is not recognized in the vast majority of Illinois cases as provocative, then the instruction should not be given. I conclude that the evidence here did not attain the qualitative threshold so as to authorize or mandate the giving of the voluntary manslaughter instruction. I would affirm the judgment of the circuit court of Kane County.