THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* WILLIAM M. MIDDLESWART, Defendant-Appellant.

Fifth District   No. 82—619

Opinion filed May 11, 1984.

Randy E. Blue and Dan W. Evers, both of State Appellate Defender's

Office, of Mt. Vernon, for appellant.

Don W. Weber, State's Attorney, of Edwardsville (John X. Breslin and Rita Kennedy Mertel, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

PRESIDING JUSTICE WELCH delivered the opinion of the court:

On January 3, 1983, defendant William Middleswart shot his wife, Patricia Middleswart, in the parking lot of a truck stop in Troy, Illinois, causing her death. He has not denied shooting her. The primary issue presented by this appeal is instead whether the defendant was acting under a sudden and intense passion resulting from serious provocation when he did so. A jury in the circuit court of Madison County found the defendant guilty of murder, but he asserts that the evidence at trial proves him guilty only of voluntary manslaughter. He also takes issue with certain jury instructions and his 30-year sentence of imprisonment.

The defendant had been married to Patricia for several weeks at the time of her death. He was divorced from his first wife, Carla, shortly before his marriage to Patricia. The defendant was an over-the-road trucker, and in late December 1982 and early January 1983 he was traveling with Patricia on what was intended as a combination of a business trip and honeymoon. He picked up a load of paper in Green Bay, then they spent New Year's Day in Madison, Wisconsin, and the following evening in Bloomington, Illinois. They left Bloomington in the morning of January 3, and arrived at a truck stop in Troy, Illinois, in the mid-afternoon hours. The defendant was scheduled to deliver his load of paper at Granite City that day.

Soon after arriving in Troy, the defendant walked to a nearby western store, bought his wife a cowboy hat, and then they entered the "This is It" lounge, across the street from the truck stop. Patricia and the defendant ordered several beers and watched a football game on television, after he finished working on his log books. Carl Kirchaner, who was tending bar at the tavern that afternoon, recalled a couple who entered at 3 p.m. He served them three or four beers apiece. Kirchaner described the couple as amicable, and as "having a joyous time," but he was not certain whether he could identify the defendant. Kirchaner left the bar after 6 p.m.

The defendant and Patricia remained at the lounge after Kirchaner's departure. Kirchaner was replaced by Patricia Gum, who owns the "This is It" lounge. Ms. Gum observed the defendant and

Patricia enter her establishment at about 3 p.m., and she testified that, at first, the Middleswarts did not appear contentious. She spoke with Patricia Middleswart and ascertained that she was from Nebraska.

At about 9 p.m., the defendant and Patricia began to quarrel. Patricia instigated the argument, according to Ms. Gum and the defendant. She told the defendant that she was unhappy because the defendant's family did not accept her since she had been a prostitute before their marriage. Patricia told him that his family did not appreciate the sacrifice she had made in giving up prostitution for him. At trial, the defendant acknowledged that he was aware of Patricia's previous activities long before he married her.

Ms. Gum recalled that she turned up the juke box so that the Middleswarts would not disturb the other patrons. She said that the defendant then left the bar twice by himself and returned to persuade Patricia to go with him, but she would not. The defendant testified that he left the lounge only once by himself, with his log books, and he went to his truck to wait for Patricia. When she did not join him, he returned to the bar.

Upon the defendant's return, Ms. Gum overheard Patricia warn the defendant not to touch her or "Mr. X would do away with him." The defendant did not strike Patricia during the argument, but he occasionally took hold of her arm. Ms. Gum heard Patricia tell the defendant that she intended to leave him, and that defendant corroborated that statement, but she did not hear Patricia say that she made a date for that evening with another man. Patricia did speak with another truck driver at the tavern, and he shared some food with her. That conversation took place in the presence of Ms. Gum and the defendant.

After 10 p.m., the Middleswarts finally left the tavern. Ms. Gum did not consider either of them intoxicated, but the defendant said that he had had "more than enough to be considered legally drunk," because he drank two or three beers every hour at "This is It." He also indicated at trial that he took one double dexedrine pill in Bloomington and another pill upon arriving at Troy. However, in statements given the day of the shooting and the next day, the defendant told the authorities that he drank only five or six beers that night and did not take any drugs. The defendant testified that Patricia was not intoxicated.

Patricia and the defendant returned to the parking lot of the truck stop, where Patricia locked herself in the cab of the defendant's truck. The defendant later recounted to police that he had to break a

vent window to enter the cab. Once he was again inside the cab, the defendant continued the argument with Patricia. She told him that things would be better once they moved from Kearney, Nebraska, to Omaha because she "could make a lot of money in Omaha." She explained that she wanted to go back to prostitution, starting that evening. Patricia said that a truck driver had offered her $20 to stay the night with him, and she intended to accept his offer. She also told the defendant that she wanted a divorce and she would find her own way back to Nebraska. Patricia informed the defendant that she would be in another truck several trucks away from the defendant's rig, and then she exited the cab.

The defendant followed her out of the cab, exhorting her not to leave. She shouted an obscenity to him in reply. The defendant then removed a pistol from his pocket. He recalled at trial, "And all I could think of at that time was, it's all over, you know, my whole world's gone. I gave up one woman and two children to—I gave up my two sons, I walked out on them and left a house, a steady job and now Patricia's leaving and I won't have her, *** I don't have anything left." Two psychologists who examined the defendant described him as an anxious and explosive individual, capable of generating anger and hostility and with a tendency to overreact to an emotional situation. In a statement made the night of the shooting, the defendant indicated, "I flipped out."

At trial, he recounted that while standing outside the truck, Patricia was screaming at him at the top of her lungs. He had told police that she stated, "Okay, big man blow me away." According to the defendant, "she tried to reach out and grab at me and I took a step back and I heard an explosion. Patricia fell." The defendant continued to shoot her after she fell to the ground. The pathologist who performed an autopsy on Patricia's body was of the opinion that her death was caused almost instantaneously by the shots, three of which entered her brain.

After shooting Patricia, the defendant pointed the revolver at himself. He pulled the trigger, but the bullet only grazed his head. He went back into the cab, searched in the sleeper for more ammunition, and then reloaded the gun. As he later told police, he reconsidered his decision to kill himself, and thought that as long as he had missed himself, he "might as well leave." He returned to Patricia's body, saw that it was partially under his trailer, then moved it under another trailer. The defendant left the truck stop in his rig, quickly and with his lights off. He was apprehended in minutes, several miles from the truck stop, after he had tossed the revolver away near an interstate

ramp. It was later recovered.

With the exception of a few details, the evidence presented at trial is not conflicting. The defendant argues that this evidence establishes his guilt of voluntary manslaughter rather than murder. A person commits voluntary manslaughter when he kills an individual without lawful justification, "acting under a sudden and intense passion resulting from serious provocation ***." (Ill. Rev. Stat. 1983, ch. 38, par. 9—2(a).) Serious provocation is "conduct sufficient to excite an intense passion in a reasonable person," and thus provocation must be shown objectively, not subjectively. (Ill. Rev. Stat. 1983, ch. 38, par. 9—2(a); *People v. Matthews* (1974), 21 Ill. App. 3d 249, 314 N.E.2d 15.) The acts which the law recognizes as serious provocation are substantial physical injury or assault, mutual quarrel or combat, illegal arrest, and adultery with the offender's spouse, but not mere words or gestures or trespass to property. *People v. Strong* (1979), 79 Ill. App. 3d 17, 398 N.E.2d 216.

■ The defendant's altercation with Patricia fails to raise a jury question concerning whether he acted under serious provocation resulting from a "mutual quarrel or combat." (*People v. Neal* (1983), 112 Ill. App. 3d 964, 446 N.E.2d 270.) Although the defendant touched Patricia's arm several times in the tavern, they certainly never came to blows, and Patricia was attempting to depart the defendant's rig when he followed her, continuing the dispute. (Compare *People v. Seaberry* (1978), 63 Ill. App. 3d 718, 380 N.E.2d 511.) The only remaining type of provocation arguably applicable to this case is that resulting from adultery. The People do not say that the facts of this case raise no jury question concerning the existence of that type of provocation. We believe that an issue of fact has been presented on whether the defendant acted under legally cognizable provocation. (*People v. Carr* (1980), 91 Ill. App. 3d 512, 414 N.E.2d 1108; *People v. Ahlberg* (1973), 13 Ill. App. 3d 1038, 301 N.E.2d 608.) Yet, the defendant's argument is not whether the jury could have so found, but whether the evidence compels such a finding.

Few Illinois cases have determined what adultery-related conduct constitutes sufficient provocation to justify a conviction of voluntary manslaughter instead of murder. Generally, adultery with a spouse as provocation "has been limited to those instances where the parties were discovered in their act of adultery, or immediately before or after its commission, and the killing must have followed immediately upon detection." (*People v. Wax* (1966), 75 Ill. App. 2d 163, 182, 220 N.E.2d 600, 610; *People v. Jenkins* (1975), 30 Ill. App. 3d 1034, 333 N.E.2d 497.) Proof of this provocation has often been found insuffi-

cient even to raise a jury question in Illinois, either because the alleged adulterous conduct or its discovery or admission was remote from the killing (*People v. Wax* (1966), 75 Ill. App. 2d 163, 220 N.E.2d 600; *People v. Arnold* (1974), 17 Ill. App. 3d 1043, 309 N.E.2d 89) or because there was no evidence that adultery had occurred or was threatened (*People v. Jenkins* (1975), 30 Ill. App. 3d 1034, 333 N.E.2d 497). Here, however, the victim, a former prostitute, expressed her intentions to resume her trade that evening, a few trucks away from the defendant's rig, and her death occurred very shortly after she made those intentions plain.

Nevertheless, we do not agree with the defendant's position that this evidence supports only a conviction of voluntary manslaughter. The trier of fact must normally determine whether a homicide is murder or manslaughter, and a reviewing court will disturb a finding of guilty only where the evidence is so unreasonable, improbable or unsatisfactory as to leave a reasonable doubt of the defendant's guilt. (*People v. Evans* (1981), 92 Ill. App. 3d 874, 416 N.E.2d 377.) It has been stated that words alone, even those that carry messages of adultery, are insufficient evidence of provocation (*People v. Arnold* (1974), 17 Ill. App. 3d 1043, 309 N.E.2d 89; but see *People v. Ahlberg* (1973), 13 Ill. App. 3d 1038, 301 N.E.2d 608), and, given this principle, the jury could have found that the actions of the decedent did not constitute serious provocation. The evidence accordingly supports the defendant's murder conviction.

■■ Next, the defendant argues that the court erred in giving the jury an issues instruction for murder which did not require the State to prove that he was not acting under serious provocation when he shot his wife. He did not present this objection at the instruction conference or in his written post-trial motions. This issue has therefore not been preserved for our review. (*People v. Huckstead* (1982), 91 Ill. 2d 536, 440 N.E.2d 1248.) Nor does the omission of the language now requested by the defendant rise to the level of plain error (*People v. McGee* (1982), 110 Ill. App. 3d 766, 775, 443 N.E.2d 1057, 1063-64), especially in view of authority holding that issues instructions in murder cases need not require the State to negate that the defendant acted under serious provocation. (*People v. March* (1981), 95 Ill. App. 3d 46, 419 N.E.2d 1212.) Defendant's reliance on *People v. Stuller* (1979), 71 Ill. App. 3d 118, 389 N.E.2d 593, is misplaced. *Stuller* was concerned with inconsistent verdicts, and the jury had returned a verdict of guilty on both the manslaughter and the murder charge, unlike the case at bar where the verdict was guilty of murder alone. *People v. McGee* (1982), 110 Ill. App. 3d 766, 775, 443 N.E.2d 1057, 1063; see

also *People v. Fox* (1983), 114 Ill. App. 3d 593, 449 N.E.2d 261.

■■ Finally, the defendant characterizes his 30-year sentence of imprisonment as excessive. No evidence in aggravation or mitigation was presented at the sentencing hearing. The trial court found in mitigation that the defendant acted under a strong provocation (Ill. Rev. Stat. 1983, ch. 38, par. 1005—5—3.1(a)(3)) and that his conduct was the result of circumstances unlikely to recur (Ill. Rev. Stat. 1983, ch. 38, par. 1005—5—3.1(a)(8)). In aggravation, the defendant has a prior felony conviction, although it was entered in 1971 (Ill. Rev. Stat. 1983, ch. 38, par. 1005—5—3.2(a)(3)), and, as the trial court indicated, the sentence imposed would have a deterrent effect (Ill. Rev. Stat. 1983, ch. 38, par. 1005—5—3.2(a)(7)). The record shows that deterrence was not the sole justification for the sentence, but, as the People argue, that factor is especially important in this case because the shooting occurred during a domestic quarrel.

In sentencing the defendant, the court stated that it could not "overlook the fact that [the defendant's] conduct and behavior resulted in the infliction of death to another person." The defendant argues that inasmuch as death occurs in all homicides, the court should not have considered that factor in determining his sentence. (But see *People v. Horstman* (1981), 103 Ill. App. 3d 17, 430 N.E.2d 523.) However, even if a court may not rely upon that factor, the record confirms that the trial court noted the death of the victim only briefly and gave no weight to that factor in imposing sentence. (*People v. Bourke* (1983), 96 Ill. 2d 327, 449 N.E.2d 1338.) The defendant's sentence is fully justified on other grounds. In addition to the aggravating factors found by the court, the evidence at trial indicates that the defendant shot Patricia several times after she fell to the ground. Also, he then left the truck stop with the lights of his truck turned off, discarded the murder weapon, and stopped his truck only after being confronted by a deputy with a shotgun. In determining a sentence, the court may consider the nature and circumstances of the offense, as well as the character of the defendant; appropriate deference must be paid to the trial court's superior ability to evaluate the defendant's conduct. (*People v. Requena* (1982), 105 Ill. App. 3d 831, 435 N.E.2d 125.) Under these standards, we cannot say that the sentence imposed on the defendant constituted an abuse of discretion. *People v. Cox* (1980), 82 Ill. 2d 268, 412 N.E.2d 541.

The judgment of the circuit court of Madison County is affirmed.

Affirmed.

JONES and KASSERMAN, JJ., concur.