THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RICHARD WILEY, Defendant-Appellant.

First District (5th Division)   No. 1—87—0548

Opinion filed June 30, 1989.

Michael J. Pelletier and Gordon H. Berry, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Inge Fryklund and Marilyn F. Schlesinger, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE MURRAY delivered the opinion of the court:

After a bench trial, defendant Richard Wiley was convicted of murder (Ill. Rev. Stat. 1985, ch. 38, par. 9—1) and sentenced to 30 years' imprisonment. On appeal, he urges that: (1) his murder conviction should be reduced to voluntary manslaughter (Ill. Rev. Stat. 1985, ch. 38, par. 9—2) and that we remand the cause for a resentencing hearing; or (2) that his conviction should be reduced to "guilty [of murder or voluntary manslaughter] but mentally ill" and his sentence reduced or the cause remanded for resentencing; or (3) that we reduce his sentence of 30 years to 20 years.

On April 12, 1985, defendant concededly killed his wife, Ruth. The following evidence was adduced at trial. On April 12 at approximately 6:10 p.m., defendant summoned the police by calling "911"; he identified himself, asked that an ambulance be sent to his home at 2503

North Oak Park Avenue, and stated he had stabbed his wife in "the chest and on top of her" and that she was unconscious. Chicago police officer Michael Stephens went to defendant's home, heard sobs from within, and found the door ajar. He entered the house and saw defendant in the living room kneeling over the body of his wife; she was lying face up and was nude from the waist down. Officer Stephens observed that defendant was not under the influence of alcohol—he did not sway, slur his speech or appear off-balance—and a fellow officer concurred in this observation. (On cross-examination, however, Stephens testified that the police report stated that defendant "Had Been Drinking (H.B.D.).") Stephens took defendant to the kitchen and he related that he and his wife had argued. Paramedics subsequently arrived and announced that defendant's wife was dead. Defendant then yelled "Oh God" or "Oh no" and ripped off his shirt. The officers then handcuffed defendant, placed him under arrest, and took him to the station house.

At the station house, Detective Raymond Shalk spoke to defendant about the stabbing incident. Defendant explained that his wife was upset because he had cancelled their vacation trip to Jamaica, he was angry at her because he had heard a comment from a neighbor about her staying out late, and that he believed his wife was having an affair with someone. Defendant further stated that when their argument intensified, he lost control, picked up a "ceremonial" knife from a drafting table in the living room, then stabbed his wife several times. Upon realizing "his action was wrong," he called the police and then his father.

Detective Ernest Halvorsen also spoke to defendant at the station house later that day. Defendant told Halvorsen that his argument with his wife began in the bathroom, he hit her with a pop bottle, he later stabbed her but he did not remember how many times, and that he had been drinking. Halvorsen observed that defendant displayed no sorrow or remorse for what he had done.

Dr. Michael Chambliss, a Cook County deputy medical examiner, testified that the victim had been stabbed 23 times, suffering wounds to her chest, back, abdomen, right thigh, buttock and arm, and her fingers and hands. Dr. Chambliss also found blunt trauma injuries producing abrasions, lacerations or contusions on the victim's left shoulder, right chest, forehead, eye and cheek, and hemorrhaging under the victim's scalp. The cause of death was a stab wound to the chest.

Debbie MacDuff, a friend and co-worker of the victim, testified that she called her between 6:10 and 6:15 p.m. to make arrangements with her for going out that evening. Defendant answered the tele-

phone and told her her "timing" in calling was "bad," "I can't handle this anymore," and "How do you think it makes me look and feel when my neighbor tells me Ruth's been staying out late?" Defendant also told MacDuff that his relationship with his wife was "terminated," using the word "terminated" several times. MacDuff asked defendant twice to speak to his wife, but defendant declined. During the conversation, which lasted approximately five minutes, MacDuff heard a faint gurgling sound in the background. MacDuff also testified that she and the victim went out together frequently, staying out late; that she had spoken to her about her relationship with a man named Jack Evans, but she did not know the full extent of the relationship; that if Evans appeared when they were out for the evening, the victim would stay at the night club when she decided to go home; and that she was aware that the victim had filed for divorce about a year prior to her death.

Jack Evans, who testified for the defense, admitted that he and the victim had been lovers for nine months in 1983; that he knew defendant before beginning the relationship with his wife and that their relationship never changed even after defendant learned of the affair; his affair with the victim ended when defendant spoke to him about it and he withdrew from it to give defendant an opportunity to reestablish the marriage; and that he was never aware of the fact that the victim had become pregnant, had had an abortion, or whether he was the father of the child. Evans further testified that he never sought out defendant after this time, but, in 1985, he saw the victim at a bar, she told him she was still having marital problems, and she wanted to resume their relationship. Subsequently, in February 1985, he attended a party at defendant's home and he sensed defendant knew his wife was "seeing" someone. During the evening, defendant took his car keys and refused to let him drive home. An altercation arose between the two men, and when he turned to leave, defendant struck him on the back of his head with a bottle. Evans nevertheless continued his affair with the victim until her death.

Defendant testified on his own behalf. He stated he was 31 years old and an honors graduate of Northern Illinois University. On April 12 he stayed home from work because of a sinus infection. At approximately 1 p.m. he began drinking wine and whiskey and continued doing so until 5:15 p.m. At some point he started his barbecue and a neighbor came over and they ate dinner. His wife came home from work at 5:15 p.m., "had some conversation with him in passing," and went into the house. After his neighbor went home, he went inside the house and he and his wife got into an argument about his staying

home from work and not having enough money for a trip to Jamaica which they had planned. When the argument became more heated, he called his bank sometime before 6 p.m. and cancelled a check for the trip; his wife was in the bathroom showering at the time. Their argument continued, becoming more intense and loud. After his wife accused him of "terrorizing" her sister, Mary Beth Hartford, during a trip to Wisconsin, he called Hartford to prove that he had not done so, but she was not at home. Thereafter, at approximately 5:45 p.m., he received a telephone call from Debbie MacDuff. He told MacDuff that his wife was in the shower, they were arguing, and his wife was unable to come to the telephone. At 6 p.m., Hartford called him. (Contrary to defendant's testimony, Hartford testified she never telephoned him.) Later, after having talked to Hartford, he "went into the bathroom and told his wife—who was putting on her make-up for her evening activities—that she was lying." He made several accusations about her staying out late and that she was probably having an affair "and seeing Jack," and she replied, "Yes." He then "exploded," struck her with a pop bottle, and proceeded to stab her numerous times.

More specifically, on direct examination, defendant admitted that he told Dr. Richard Elliot, a psychiatrist, that he supposed hitting his wife with a bottle "just wasn't enough for the betrayal" she had inflicted on him. He stated that everything then happened "fast." He heard a thud after he hit his wife, vaguely recalled struggling with her, picked up a knife, and lunged at her. He further stated that the next thing he remembered was "there was air coming out of her, she said she loved me and she went unconscious."

On cross-examination, defendant stated that the drafting table, where the murder weapon was located, was six to eight feet away from the bathroom in the living room. When he returned to the bathroom with one of four knives which were on the table, his wife was standing in the doorway, facing him. She wore only a polo shirt and was putting on her makeup when he lunged at her and struck her in the shoulder. He admitted having told a psychiatrist that he aimed for his wife's chest; at trial he denied this was true. He further testified that he did not think of the propriety of his actions—rather, "it just happened." Defendant subsequently called "911" and his father.

Defendant's father testified that defendant sounded hysterical and depressed when he spoke to him after the slaying and appeared distraught at the station house. He also testified that the day after the slaying he found two wine jugs and a whiskey and champagne bottle in defendant's garage.

Defendant's mother testified that defendant had a history of emotional outbursts in which he would strike out at others, including her and his first wife, and that he also damaged property. Specifically, he once pulled a knife on his mother, he threw a beer bottle at his father, striking him in the forehead, he had violently retaliated against his first wife (who subsequently divorced him due to his extramarital affairs) when she locked him out of their house while he was drinking, he hit Jack Evans over the head with a bottle a few weeks prior to the stabbing of his wife, and he broke into his wife's employer's office, stole some money and destroyed property while under the influence of hallucinogens. Defendant's mother also stated that he was self-centered, liked to control things and had "explosions" to get his way. Defendant also described himself as a bully as a child who had always had problems with his temper; he once broke a schoolmate's arm. The record further discloses that defendant underwent four different courses of out-patient psychotherapy and three drug and/or alcohol-based hospitalizations in 1983 and 1976. Defendant had also used hallucinogens since high school and drank alcohol as well.

Dr. Richard Elliot, who testified as an expert on defendant's behalf, stated that based on three interviews with defendant, as well as reports from other treatment facilities and psychiatrists who dealt with defendant, his diagnosis was that defendant suffered from alcohol intoxication, alcohol abuse and substance abuse, an intermittent explosive disorder, and an atypical personality disorder with borderline features.

Dr. Gerson Kaplan, the State's expert, disagreed with Dr. Elliot's diagnosis. He diagnosed defendant as having a borderline personality disorder with alcohol and drug abuse. He also stated that defendant knew what he was doing and intended to kill his wife and that he had the capacity to control his actions.

In finding defendant guilty of murder, the trial court rejected as inapplicable the offense of voluntary manslaughter or a finding of "guilty but mentally ill," and this appeal followed.

■ Defendant first argues that he was not found guilty of murder beyond a reasonable doubt and instead he should have been found guilty of voluntary manslaughter on the bases of the victim's provocation in confessing to him that she was having an affair and his "impaired mental condition." Under the Criminal Code of 1961, voluntary manslaughter requires that at the time of an unlawful killing the perpetrator was "acting under a sudden and intense passion resulting from serious provocation" by the individual killed. (Ill. Rev. Stat. 1985, ch. 38, par. 9—2.) "Serious provocation is conduct sufficient to

excite an intense passion in a reasonable person" (Ill. Rev. Stat. 1985, ch. 38, par. 9—2(a)(2)) and thus the provocation must be shown objectively, not subjectively (*People v. Middleswart* (1984), 124 Ill. App. 3d 35, 463 N.E.2d 1050). As a general rule in Illinois, the categories of provocation which are sufficient to reduce the crime of murder to voluntary manslaughter are substantial physical injury or assault, mutual quarrel or combat, illegal arrest, or adultery with the offender's spouse. (*People v. Fausz* (1983), 95 Ill. 2d 535, 449 N.E.2d 78.) Mere words, however aggravated, abusive, opprobrious, or indecent, are not sufficient provocation (*People v. Neal* (1983), 112 Ill. App. 3d 964, 446 N.E.2d 270), and adultery by a spouse has generally been limited to those instances where the parties were discovered in the act of adultery or immediately before or after its commission (*People v. Middleswart* (1984), 124 Ill. App. 3d 35, 463 N.E.2d 1050).

■ An exception to the above general rules has developed based on verbal revelations of infidelity and other conduct. The exception is applicable in the situation where a revelation of adultery is made after a series of provoking statements or circumstances. See *People v. Ambro* (1987), 153 Ill. App. 3d 1, 505 N.E.2d 381 (victim announced publicly to a group that she no longer loved the defendant and was going to seek a divorce, on the night of her death she implied the defendant was not the father of her children, she called the defendant an alcoholic, she told him she was going to take their children away from him, and, when the defendant asked her how he could restore their relationship, she informed him of her adultery and then goaded him to kill her); *People v. Carr* (1980), 91 Ill. App. 3d 512, 514, 414 N.E.2d 1108 (the defendant's wife moved out of the marital home, the defendant informed a cousin of the victim that he would kill his wife if she tried to remove any furniture from their home, the wife returned to the home to remove some furniture, she told the defendant " 'At least now I have a real man,' " and defendant shot her); *People v. Ahlberg* (1973), 13 Ill. App. 3d 1038, 301 N.E.2d 608 (victim moved out of the marital home with the parties' children without informing the defendant, the defendant looked for her for several days, when the victim finally contacted the defendant she informed him that she was getting a divorce, she told him that he never satisfied her sexually, and that she had found an older man who could love her and the children more than he could).

We find the foregoing exception inapplicable to this case. During the parties' argument, the victim merely commented on the fact that if defendant went to work instead of staying home they would have enough money to go on vacation. Defendant presented no evidence

that the victim went into detail about having an affair with Jack Evans and, in fact, defendant stated at one point that he did not know the identity of the man who was having an affair with his wife. We further note that the victim did not announce she was having an affair; defendant brought the subject up and, in demanding a confession, the victim merely answered in the affirmative. Although the parties had marital problems in the past, there is no evidence in the record that they had been having daily, weekly or even monthly arguments since that time or immediately prior to the victim's death; defendant had merely taken notice that the victim was frequently staying out late and coming home in the morning hours and that a neighbor had commented on the fact. Accordingly, we find, as apparently did the trier of fact, that the limited remarks by the victim to defendant did not constitute the type of provocation recognized in Illinois as sufficiently serious to reduce the charge of murder against defendant to voluntary manslaughter. We agree with the trial court that "from simply a public policy standpoint, society did not condone or expect that the spouse—even when given an unfaithful spouse, should be permitted to take the person's life upon disclosure of the unfaithfulness."

We further observe, *arguendo*, that if we were to hold that the victim's remarks constituted serious provocation causing defendant's actions, only defendant's hitting the victim over the head with a bottle, had she died as a result thereof, would constitute voluntary manslaughter, but not his subsequent stabbing of the victim in light of the fact that he removed himself from the situation and/or provoking comment, which caused him to "explode," by going into the living room. The victim made no further comments after that time and defendant's subsequent stabbing of her could not be deemed to have occurred because of any serious provocation by her. In other words, defendant had time to reflect after his initial "explosion" and, therefore, his act in stabbing his wife 23 times thereafter was clearly not a result of a "hair trigger" type of an "explosion"; he clearly intended to kill or do great bodily harm to his wife or knew that there was a strong probability that his acts would cause death or great bodily harm (see Ill. Rev. Stat. 1985, ch. 38, par. 9—1) when he decided that hitting his wife with a bottle "just wasn't enough." Defendant's stabbing of his wife constituted the crime of murder beyond a reasonable doubt, not voluntary manslaughter. Since the trial court was in the best position to observe the witnesses, heard their testimony, and concluded that defendant's conduct was not the result of any serious provocation by the victim that justified the reduction of

the crime from murder to voluntary manslaughter, we find no reason to disturb its determination.

Defendant further argues that his "impaired mental condition" by itself required a reduction of the charge of murder to voluntary manslaughter. Defendant's argument is apparently based on his expert's diagnosis that he had an "intermittent explosive disorder." He cites to cases where the defendants were intoxicated at the time they committed a homicide and our courts held that their intoxication was a factor to be considered in reducing a murder charge to voluntary manslaughter. (See *People v. Woollums* (1981), 93 Ill. App. 3d 144, 416 N.E.2d 725; *People v. Zynda* (1977), 53 Ill. App. 3d 794, 368 N.E.2d 1079; *People v. Johnson* (1975), 32 Ill. App. 3d 36, 335 N.E.2d 144.) Specifically, defendant contends that "[t]hese cases support defendant's argument that a serious mental disorder, though short of insanity, could reduce murder to manslaughter in appropriate cases because if a person who *voluntarily* impairs his mental state by drinking alcohol may only be guilty of manslaughter, surely one whose mental state is involuntarily impaired, due to a mental disorder, deserves the same treatment." (Emphasis in original.) We find it unnecessary to address this specific argument because at a minimum it depends upon the existence of a serious impaired mental condition which the trial court rejected and which we reject as discussed below relative to defendant's overlapping argument that the trial court should have found him guilty but mentally ill.

■ It should be noted that although defendant concedes in his appellate brief that his mental illness falls short of insanity, he nonetheless appears to contend that because he was "partially" mentally impaired he should have been found guilty but mentally ill. In support thereof, he relies on his expert's diagnosis that he was suffering from an "intermittent explosive disorder," along with alcoholism and drug abuse, and an "atypical personality disorder with borderline features which involve explosions grossly out of proportion to a precipitating stress followed by periods of stability."

On the other hand, the State's expert, Dr. Kaplan, diagnosed defendant as having a borderline personality disorder which merely causes a person difficulty in dealing with anger, reacting reasonably, and controlling his impulses. Dr. Kaplan further stated that defendant knew what he was doing, he intended to kill his wife, and he had the capacity to control his actions.

The term "mentally ill," authorizing a finding of "guilty but mentally ill," "means a substantial disorder of thought, mood, or behavior which afflicted a person at the time of the commission of the offense

and which impaired that person's judgment." (Ill. Rev. Stat. 1985, ch. 38, par. 6—2(d).) A finding of guilty by a trier of fact will not be disturbed on appeal on the issue of mental illness absent facts indicating a defendant's illness at the time he committed an offense and its decision should be affirmed unless the determination is so improbable or unsatisfactory as to raise a reasonable doubt as to the defendant's sanity. *People v. Christiansen* (1987), 116 Ill. 2d 96, 506 N.E.3d 1253.

◼ Here, although the record reflects that defendant had certain personality defects, enhanced by the use of alcohol and drugs, the facts do not justify this court's overturning the decision of the trial court because they do not raise a reasonable doubt as to his mental state at the time of the stabbing of his wife. As stated above, at the most defendant's hitting his wife with a bottle might constitute the crime of voluntary manslaughter had the victim seriously provoked his conduct, but defendant's stabbing of her thereafter under the actual circumstances could not; defendant acted merely out of anger, which he gave free rein to without assuming responsibility for the consequences, as he apparently did throughout his life. That this is the case is supported by other clinicians who agreed with Dr. Kaplan's assessment of defendant. One nontestifying psychologist evaluated defendant as prone to suspicion and possessing hostile attitudes. Defendant was also described as egocentric, self-righteous, grandiose and prone to deny his guilt. He expressed no remorse for the pain he had caused his victim; his only regret was that his actions led to his incarceration and curtailed his freedom. Defendant described his interpersonal relationships as competitive and uncooperative and his family relationships as discordant. Other tests showed defendant distrusted people, disrespected authority, and believed people should try to get away with whatever possible. We believe that the trial court correctly assessed defendant's mental state; it appears from the record that defendant's mental state did not rise to the level of a mental illness depriving him of all rational thought, but rather was one of common, unchecked, self-indulgent anger, exaserbated by his use of alcohol and drugs which he knew increased that anger. Dr. Kaplan's opinion and the evaluations of other witnesses amply support the trial court's conclusion in this regard. The fact that Dr. Kaplan's opinion contradicted defendant's expert's does not entitle this court to overturn the conclusion of the trier of fact on the issue; a trier of fact may give one expert's opinion more weight than another on the issue of mental illness. *People v. Wright* (1987), 161 Ill. App. 3d 967, 514 N.E.2d 817.

We further briefly observe that defendant's alleged impaired men-

tal condition is belied by the fact that after the stabbing he maintained sufficient control to respond to Debbie MacDuff's telephone call and conceal from her what he had done, he was able to call the police and place two telephone calls to reach his father in order to report the crime, and he thought to leave the door of his home ajar for the police.

In light of the foregoing, we hold that the trial court properly rejected defendant's urging that he was guilty of voluntary manslaughter or, alternatively, guilty but mentally ill.

■■ Finally, defendant argues that this court should reduce his sentence from 30 to 20 years based on the fact that the crime was "not premeditated," he is intelligent, supported by responsible members of the community, and he has a good potential for rehabilitation. The trial court considered all of these factors in imposing sentence and we can find no legal justification for reversing it. Absent a clear abuse of discretion, this court will not substitute its judgment for that of a trial judge who had the opportunity to observe defendant throughout the trial and sentencing proceedings. (See *People v. Angelly* (1988), 167 Ill. App. 3d 477, 521 N.E.2d 306.) Given the nature of defendant's crime, the brutal stabbing of his wife, we do not find his sentence of 30 years to be excessive or even greater than it would have been had he been found guilty but mentally ill as he has urged.

In light of the foregoing, we affirm defendant's conviction and sentence.

Affirmed.

PINCHAM and COCCIA, JJ., concur.