THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
TONY HARRIS, Defendant-Appellant.

First District (6th Division)   No. 1—88—3002

Opinion filed March 22, 1991.—Rehearing denied April 23, 1991.

Randolph N. Stone, Public Defender, of Chicago (Callie L. Baird, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and Marie Czech, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McNAMARA delivered the opinion of the court:

Following a bench trial, defendant, Tony Harris, was convicted of the murder of Mybola Feazell (Spanky) at 534 West Division Street in the Cabrini-Green housing project and sentenced to a term of 30 years. On appeal to this court, defendant maintains that: (1) the trial court erred in granting the State's motion *in limine* based upon the attorney-client privilege; (2) defendant was not proved guilty beyond a reasonable doubt; and (3) defendant's sentence was excessive.

The State filed a pretrial motion *in limine* to restrict evidence of an alleged prior inconsistent statement by Kirby Higgs, one of the State's eyewitnesses. After unsuccessful attempts to locate Higgs, defendant's public defender apparently asked public defender Karen Szpajer, who represented Higgs in an unrelated juvenile court matter, to tell Higgs to call him. When she relayed this message to Higgs, he

told Szpajer that he could not identify anyone in this case and that he did not want to talk about it. The State maintained that under the attorney-client privilege, neither Higgs nor Szpajer could testify as to this conversation. At the hearing on the motion, Higgs stated that "he did not want to reveal the conversation he had with Karen Szpajer, the public defender, about this case now on trial." The trial court granted the State's motion, finding that the attorney-client privilege precluded testimony about the conversations between Higgs and Szpajer.

The facts regarding the murder are as follows. Officer Alberto Contiveros testified that when he arrived at the scene of the shooting at about 3:50 a.m. on July 11, 1987, he found the deceased's body lying on the lawn about 10 to 20 feet from the northwest corner of the 534 W. Division building. He described the area as not well lighted, the only light coming from the streetlights. After talking to some of the approximately 30 people on the scene, he received two descriptions of persons who may have been involved; both were black males, one wearing a red shirt, the other, a yellow shirt.

Officer Daniel Kowalski, who arrived soon thereafter, testified that there were lights in the hallways and floodlights on the corner of the building. He described the lighting where the body was found as "poor at best." He spoke with four persons at the scene and then began to look for five or six possible suspects.

The State presented the testimony of two eyewitnesses: Kirby Higgs and Phyllis Haley. Higgs testified that on the evening of the shooting, he went to a party at 624 W. Division with Spanky and several others. Higgs and Spanky left the party together at about 3:30 a.m. and walked to 534 W. Division, where Higgs lived. Both Higgs and Spanky belonged to the same gang, which "controlled" the 534 W. Division building. When Higgs saw Jermaine Adams, a rival gang member, standing by the front doorway "just looking around," Higgs decided to enter through a different entrance. When Higgs and Spanky approached the rear door, they saw defendant standing by the elevator, dressed in a white shirt and black shorts. Higgs told Spanky that he did not know who defendant was. Higgs went to his apartment on the fifth floor, while Spanky waited near the rear entrance for his friend, "Little Man," to come down. Higgs found his apartment door locked and went to his uncle's third-floor apartment. While on the third floor, he heard a shot and looked through the metal grating of the gallery down to the ground. He saw Spanky running toward the street with defendant chasing him. He saw defendant stand over Spanky, who had fallen, and shoot him four times. Although

Higgs only saw defendant's back prior to and during the shooting, Higgs saw defendant's face when defendant turned and looked back before he ran away. Higgs stated that he had seen defendant 10 to 12 times in the prior two months and knew defendant belonged to a rival gang. Higgs, however, did not call the police until several days later. He admitted that at a codefendant's trial, he testified that he did not know the shooter; that he first saw the shooter when he fired the shots; and that he never identified the shooter in a photo or lineup. He also acknowledged that the State dismissed a pending aggravated battery charge against him prior to this trial.

Phyllis Haley testified that, at about 3 a.m. on the morning of the incident, she entered the 534 W. Division building to go to her mother's apartment. As she entered, she saw defendant and another man standing near the mailroom. She saw a gun in defendant's waistband. When she left the building 15 or 20 minutes later, she heard Spanky yell for "Little Man" to come down, and she noticed that the two men were not by the mailroom, but were on the other side of the building. She heard someone yell, "Spanky, he has a gun," then heard a shot. When she moved closer, she saw Spanky run a short distance and fall and then saw the shooter stand over Spanky with a gun and heard four shots. Haley then ran after defendant. When Haley's brother called out to her, defendant turned around and looked directly at Haley, at which time she got a "good look" at him from about 10 to 12 feet. Her brother tackled her before she caught defendant. She did not contact the police until two days later because she feared for her life. On July 31, 1987, she identified defendant as the shooter from several photographs at the police station, and on the next day she identified defendant at a police lineup. She also identified defendant at trial. She testified that she had known defendant for about 12 years and had been his tutor and Sunday school teacher at Fourth Presbyterian Church in 1977 and 1978. Over the past 10 years, she saw defendant two or three times a month and saw him the day before the shooting at a playground adjacent to the building.

Haley testified that in an April 1988 telephone conversation she told Tom Reynolds, defendant's attorney, that she was not sure if defendant was the shooter because she could not see his face. She also told Reynolds that when the police showed her photos, she told them that she could not identify the shooter because she was not that close.

Officer Bloomstrand testified that he spoke with Higgs two days after the murder. According to Bloomstrand, Higgs never stated that defendant shot the deceased, although Higgs told him that "Tony Sco-

ney" did it. Higgs told Bloomstrand that he had seen defendant 9 or 10 times before the shooting and that he knew defendant belonged to a rival gang. Bloomstrand did not recall whether Haley told him that she ran after the shooter, although neither of his case reports indicated that she ran after him, that the shooter turned around and looked at her or that she taught defendant at church. Bloomstrand stated, however, that Haley told him that she saw defendant shoot the deceased. She also identified a photograph of defendant.

Officer Carl Silvestrini testified that Haley positively identified defendant at a lineup conducted in the police station.

It was stipulated that Spanky was shot five times and died of multiple gunshot wounds.

Cora Harris, defendant's mother, testified for defendant that she is a Baptist and that defendant never attended the Fourth Presbyterian Church. She also stated that defendant lived with her at the time of the shooting, but was staying at her other son's home several blocks away.

Patrick Gleason, an attorney and chief of the Cook County Public Defender's Murder Task Force, testified for defendant that with Haley's permission he participated in the April 1988 telephone conversation between Haley and Reynolds. He testified that although Haley was cooperative, Reynolds spoke to her in an angry tone. According to Gleason, Haley told them that she could not see the shooter's face while he shot because it was too dark and she was too far away. Haley also told them that when the police showed her a group photo and when she viewed a lineup at the police station, she could not identify defendant as the shooter. Haley also said that the deceased's family had threatened her and that the police told her she would be in trouble if she "covered up for these punks."

The trial judge found defendant guilty of murder. In aggravation, the State requested an extended 60-year term because of the brutal and heinous nature of the crime. In mitigation, defendant requested leniency because he had no record, was 18 at the time of the incident, had family to support and had begun to work on his GED while in jail. The court sentenced him to a term of 30 years.

Initially, we consider defendant's argument that the trial court erred in granting the State's pretrial *motion in limine* which precluded defendant under the attorney-client privilege from questioning Higgs or Szpajer regarding their alleged conversation about this case. Defendant maintains that Higgs' statement was not protected by the privilege and, even if the privilege applied, Higgs waived it. In addi-

tion, defendant argues that the State lacked standing to assert the privilege.

■■ We first consider the purpose of the attorney-client privilege, which exists so that a client may freely consult with counsel without fear that the information will be disclosed by the attorney. (*People v. Duarte* (1979), 79 Ill. App. 3d 110, 398 N.E.2d 332.) The party asserting the privilege bears the burden of establishing all elements of the privilege, which exists when: (1) legal advice is sought; (2) from a professional legal advisor in his capacity as such; (3) the communication relates to that purpose; (4) the communication is made in confidence; (5) the communication is made by the client; (6) the communication is permanently protected; (7) from disclosure by the client or by the attorney; (8) except when the client waives the protection. *People v. Williams* (1983), 97 Ill. 2d 252, 454 N.E.2d 220.

■■ ■ Our review of the record leads us to conclude that the privilege does not apply to the brief colloquy between Higgs and Szpajer about this case. Subsequent to Higgs' April 1988 arrest, Szpajer was appointed to represent him in juvenile court. When Szpajer met with Higgs, presumably to discuss his pending case, she told Higgs that defendant's attorneys were looking for him. Higgs told her that he could not identify anyone and that he did not want to talk about it. Because Szpajer was appointed to represent Higgs in an unrelated criminal matter, his statements about this case are not protected by the privilege. Further, there is no evidence that Higgs sought legal advice from Szpajer regarding his identification of a suspect in this shooting.

Moreover, protection under the privilege extends only to confidential communications and not to matters intended to be disclosed by the attorney. (*People v. Adams* (1983), 116 Ill. App. 3d 315, 451 N.E.2d 1351.) The mere passing of information between client and attorney is not sufficient to invoke the privilege. (*McDonald's Corp. v. Levine* (1982), 108 Ill. App. 3d 732, 439 N.E.2d 475.) Here, after defense attorneys were unsuccessful in contacting Higgs, they sought Szpajer's assistance, asking her to tell Higgs to telephone them. When Higgs told Szpajer that he could not identify anyone and that he did not want to talk to defendant's attorneys, Higgs undoubtedly expected Szpajer to relay this message to defendant's attorneys. As such, Higgs' statements were intended for disclosure and were not confidential. For the foregoing reasons, these communications do not fall within the privilege and the motion *in limine* was improperly granted. Because we so conclude, we need not consider defendant's standing and waiver arguments.

■ Although the trial court erred in granting the State's motion *in limine*, a review of the excluded testimony and the record indicates that the error was harmless beyond a reasonable doubt. We, therefore, need not decide, as defendant suggests, whether the evidentiary privilege must yield to defendant's right to cross-examine and call witnesses on his behalf. In *People v. Wilkerson* (1981), 87 Ill. 2d 151, 429 N.E.2d 526, our supreme court determined that error can be harmless if other properly admitted evidence overwhelmingly supports defendant's guilt or if the excluded evidence is cumulative of other properly admitted evidence.

■ Our examination of the other evidence here leads us to conclude that there was overwhelming evidence to support defendant's guilt. Haley testified that she saw defendant with a gun in the vicinity about 20 minutes prior to the shooting, and that after hearing the first shot, she repositioned herself and observed defendant shoot deceased four times. Most significantly, she saw defendant from about 10 to 12 feet when he turned around and looked directly at her before fleeing the scene. (*People v. Pryor* (1989), 181 Ill. App. 3d 865, 537 N.E.2d 1141 (improperly admitted evidence was harmless error where an eyewitness saw defendant's face twice, once face to face).) Given Haley's acquaintance and familiarity with defendant and her repeated opportunities to observe him prior to, during and after the incident, her testimony alone overwhelmingly supports defendant's guilt. Nor would the excluded testimony suggesting Higgs' inability to identify the shooter have contradicted the strength of Haley's identification.

In addition, the excluded testimony here is cumulative. If permitted to cross-examine Higgs about the conversation at issue, defense counsel would likely have elicited evidence that in April 1988, several months before trial began, Higgs told his attorney that he was unable to identify anyone in this case. Even without this testimony, defendant established at trial that Higgs previously made several prior inconsistent statements regarding the identification at codefendant's trial, and extensively cross-examined Higgs about these statements in order to impeach Higgs. (See *People v. Rios* (1986), 145 Ill. App. 3d 571, 495 N.E.2d 1103.) Although the timing of Higgs' testimony at the codefendant's trial might distinguish it somewhat from statements made to Szpajer, it is unlikely that the excluded statements would have made any difference in the outcome.

We also note that the trial court had ample evidence before it from which to assess Higgs' credibility. The evidence established that Higgs and defendant were members of rival gangs; that Higgs did not speak to police until several days after the shooting; that he made

several prior inconsistent statements; that he never gave a complete description of the shooter or identified the shooter in a lineup or photo; that the State dismissed an aggravated battery charge against him before he testified in this case; and that he had another action pending in juvenile court. We believe that defendant was afforded sufficient opportunity to establish Higgs' lack of credibility even without the proffered impeachment evidence. Nor can we say that the excluded testimony could have reasonably affected the judgment. Therefore, we find that there was no prejudice to defendant sufficient to constitute reversible error.

■■ Defendant next contends that the State failed to prove him guilty beyond a reasonable doubt because the testimony of Higgs and Haley was inconsistent and unbelievable. As we have already discussed, this argument is unpersuasive. A reviewing court may not substitute its judgment for that of the trier of fact on questions involving the weight of the evidence or the credibility of witnesses. Nor will we reverse a conviction unless the evidence is so unsatisfactory or improbable as to raise a reasonable doubt of defendant's guilt. *People v. Manion* (1977), 67 Ill. 2d 564, 367 N.E.2d 1313.

■■ The evidence in this case is not so improbable as to require a reversal of defendant's conviction. Two witnesses positively identified defendant as the shooter. Haley saw defendant several times: when she first entered the building; after he fired the first shot; and when he turned and looked directly at her before he fled. Higgs also saw the shooter more than once. He saw defendant's face when he entered the building. Then, after hearing the first shot, he looked down from the third-floor gallery of the building and saw defendant chase Spanky and then shoot Spanky four times after Spanky fell. Higgs, like Haley, saw defendant's face when he turned and looked back before fleeing. Although defendant maintains that the lighting and the distance precluded both Haley and Higgs from getting a good look at the shooter, the first shot likely alerted the witnesses, heightened their attention during the incident and made their identifications more credible. (See *People v. Jones* (1983), 114 Ill. App. 3d 576, 449 N.E.2d 547.) Additionally, the testimony of Haley and Higgs corroborated the sequence and timing of the occurrence. Defendant was proved guilty of murder beyond a reasonable doubt.

■■ ■ Finally, we consider defendant's argument that his 30-year sentence is excessive and that the court failed to consider his age and his rehabilitative potential. Absent an abuse of discretion, we will not substitute our judgment for that of the trial judge who observed defendant throughout the trial and sentencing proceedings. (*People v.*

*Wiley* (1989), 185 Ill. App. 3d 1097, 541 N.E.2d 1345.) Moreover, a sentence alleged to be excessive, even though within the statutory limitations, will not be disturbed on appeal unless grossly disproportionate to the nature of the offense. (*People v. Moore* (1988), 178 Ill. App. 3d 531, 533 N.E.2d 463.) Defendant's 30-year sentence is within the 20 to 60-year range of sentences imposed for murder. (Ill. Rev. Stat. 1987, ch. 38, par. 1005—8—1(a)(1)(a).) The court's findings indicate that it properly considered defendant's rehabilitative potential and age when imposing the sentence. Moreover, the court's description of this as a "cold-blooded murder" supports its refusal to impose the minimum term. (*People v. Ellis* (1989), 187 Ill. App. 3d 295, 543 N.E.2d 196.) We thus find that the sentence is not grossly disproportionate to the offense and that the trial court acted within its discretion in sentencing defendant.

Accordingly, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

RAKOWSKI, P.J., and LaPORTA, J., concur.